Matthew James HALEY, Plaintiff,

v.

Gregory L. TALCOTT, and Matt & Greg Real Estate, LLC, Defendants.

C.A. No. 098–S.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 28, 2004.
Decided: Dec. 16, 2004.

---

**24.** *Orban v. Field,* 1993 WL 547187, at *9    (Del.Ch. Dec. 30, 1993).

John A. Sergovic, Jr., Sergovic & Ellis, P.A., Georgetown, DE, for Plaintiff.

James D. Griffin, and Alix K. Robinson, Griffin & Hackett, P.A., Georgetown, DE, for Defendants.

## OPINION

STRINE, Vice Chancellor.

Plaintiff Matthew James Haley has moved for summary judgment of his claim seeking dissolution of Matt and Greg Real Estate, LLC ("the LLC"). Haley and defendant Gregory L. Talcott are the only members of the LLC, each owning a 50% interest in the LLC. Haley brings this action in reliance upon § 18–802 of the Delaware Limited Liability Company Act which permits this court to "decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[1] The question before the court is whether dissolution of the LLC should be granted, as Haley requests, or whether, as Talcott contends, Haley is limited to the contractually-provided exit mechanism in the LLC Agreement.

Haley and Talcott have suffered, to put it mildly, a falling out. There is no rational doubt that they cannot continue to do business as 50% members of an LLC. But the path to separating their interests is complicated by a second company, Delaware Seafood, also known as the Redfin Seafood Grill ("Redfin Grill"), a restaurant

---

1. 6 *Del. C.* § 18–802.

that, at the risk of slightly oversimplifying, was owned by Talcott and, before the falling out, operated by Haley under an employment contract that gave him a 50% share in the profits. The LLC owns the land that the Redfin Grill occupies under an expired lease. The resolution of the current case and the ultimate fate of the LLC therefore critically affect the continued existence of a second business that one party owns and that the other bitterly contends, in other litigation pending before this court, wrongly terminated him.

The question before the court is essentially how the interests of the members of the LLC are to be separated. Haley asserts that summary judgment is appropriate because it is factually undisputed that it is not reasonably practicable for the LLC to carry on business in conformity with a limited liability company agreement (the "LLC Agreement") that calls for the LLC to be governed by its two members, when those members are in deadlock. Therefore, urges Haley, the LLC should be judicially dissolved immediately. Such an end will force the sale of the LLC's real property, which is likely worth, at current market value, far more than the mortgage that the LLC must pay off if it sells.

In response, Talcott stresses that the LLC Agreement provides an alternative exit mechanism that allows the LLC to continue to exist, and argues that Haley should therefore be relegated to this provision if he is unhappy with the stalemate. In other words, Talcott argues that it is reasonably practicable for the LLC to continue to carry on business in conformity with its LLC Agreement because the exit mechanism creates a fair alternative that permits Haley to get out, receiving the fair market value of his share of the property as determined in accordance with proce-

dures in the LLC Agreement, while allowing the LLC to continue. Critically, the exit provision would allow Talcott to buy Haley out with no need for the LLC's asset (i.e., the land) to be sold on the open market. The LLC could continue to exist and own the land (with its favorable mortgage arrangement) and Talcott, as owner of both entities, could continue to offer the Redfin Grill its favorable rent.

But the problem with Talcott's argument is that the exit mechanism is not a reasonable alternative. A principle attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business "relationship" problems. If an equitable alternative to continued deadlock had been specified in the LLC Agreement, arguably judicial dissolution under § 18–802 might not be warranted. In this case, however, Talcott admits that the exit mechanism provides no method to relieve Haley of his obligation as a personal guarantor for the LLC's mortgage. Haley signed an agreement with the lender personally guaranteeing the entire mortgage of the LLC (as did Talcott) in order to secure the loan. Without relief from the guaranty, Haley would remain personally liable for the mortgage debt of the LLC, even after his exit. Because Haley would be left liable for the debt of an entity over which he had no further control, I find that the exit provision specified in the LLC Agreement and urged by Talcott is not sufficient to provide an adequate remedy to Haley under these circumstances.

With no reasonable exit mechanism, I find that Haley is entitled to exercise the only practical deadlock-breaking remedy available to him, and one that is also alluded to in the LLC Agreement,[2] the right to

---

2. *See* LLC Agreement § 17(1)(a)(iv) (providing

that the company shall be dissolved "upon the

seek judicial dissolution. Haley argues, convincingly, that the analysis under § 18–802 for an evenly-split, two-owner LLC ordinarily should parallel the analysis under 8 *Del. C.* § 273, which enables this court to order the judicial dissolution of a joint venture corporation owned by dead-locked 50% owners. Because Haley has demonstrated an indisputable deadlock be-tween the two 50% members of the LLC, and that deadlock precludes the LLC from functioning as provided for in the LLC Agreement, I also grant Haley's motion for summary judgment and order dissolution of Matt and Greg Real Estate, LLC.

## I. *Factual Background* [3]

Haley and Talcott each have a 50% in-terest in Matt & Greg Real Estate, LLC, a Delaware limited liability company they formed in 2003. The creation of the com-pany, however, is only a recent event in the history between the parties.

Haley and Talcott have known each oth-er since the 1980s. In 2001 Haley was the manager of the Rehoboth location of The Third Edition, a restaurant owned by Tal-cott that also had a location in Washington, D.C. In 2001, Haley found the location for what would become the Redfin Grill. Tal-cott contributed substantial start-up mon-ey and Haley managed the Redfin Grill without drawing a salary for the first year.

The structure of the agreements be-tween the parties forming the Redfin Grill is complex and the subject of additional litigation before this court.[4] For reasons that are not relevant, Haley and Talcott chose to create and operate the Redfin Grill as an entity solely owned by Talcott, with Haley's rights and obligations being defined by a series of contracts. Those agreements, all dated November 30, 2001, included an Employment Agreement, a Retention Bonus Agreement, and a Side Letter Agreement (together, the "Employ-ment Contract"), as well as an Agreement regarding an option to purchase real estate (the "Real Estate Agreement").[5]

occurrence of any event that the Delaware [Limited Liability Company] Act requires dis-solution").

3. The undisputed facts discussed below are drawn either directly from the underlying, contractual documents or from the verified complaints in this matter and in the related case between the parties before this court. Haley incorporated both complaints by refer-ence in his summary judgment brief. Addi-tional undisputed details of the history of the parties' relationship were represented to the court by counsel at oral argument. Unless otherwise noted, the material facts are not in dispute.

4. Haley's second suit, accuses Talcott and the Redfin Grill of, among other things, breach of contract, wrongful termination, breach of fi-duciary duty, and fraud. These cases have not been consolidated, but their subject mat-ter is so interwoven that the facts of that suit must be at least touched upon in examination of this one. Nevertheless, it is not my inten-tion to resolve any of the factual questions of the second case, which are much more com-plex and contested then those presented here. Although the fact that allegations have been made in the related suit is material to the question before me here, i.e., whether the LLC can continue to operate in accordance with the LLC Agreement, any comment on the merits of these allegations would be prema-ture and accordingly I imply no conclusions regarding them.

5. The Employment Agreement, Retention Bo-nus Agreement and Side Letter Agreement are attached as Exhibits A, B, and C, respec-tively, to Haley's Verified Complaint in the related matter before this court; that Verified Complaint, in turn, is attached with exhibits as Exhibit 1 to Plaintiff's Opening Brief In Support of Motion to Strike and Summary Judgment and incorporated therein by refer-ence. For specificity, citations to the Em-ployment Contract will be made to the partic-ular, component document's exhibit number as Pl. Ex. 1A, 1B or 1C. The Real Estate Agreement is similarly attached to Haley's Brief as Exhibit D to Exhibit 1, the Verified Complaint and is cited as Pl. Ex. 1D.

The Employment Contract, although structured as an agreement between an employer and an employee, makes clear that the parties were operating the business as a joint venture. The Employment Contract specified that Haley reported to Talcott and that Talcott had the right to reevaluate and revise Haley's decisions, but indicated that "such action is not anticipated." [6] It also provided that Haley's "bonus" would be one half of the net profits of the Redfin Grill, after the initial loan from Talcott was repaid.[7] Moreover, Talcott would materially breach the Employment Contract, and Haley could end his employment for cause, if Talcott amended Haley's duties such that his position as "Operations Director" became one of "less dignity, responsibility, importance or scope." [8] The Employment Contract further clarified Haley's importance to the enterprise by awarding him one half of any proceeds from any sale of the Redfin Grill.[9] Finally, the Employment Contract limited Talcott's ability to remove Haley from his active role:

> [N]otwithstanding the language in the Employment Agreement relating to termination, individually, I [Talcott] will assure you that the Employment Agreement will not be terminable under any circumstances unless an event occurs that would entitle you payment of a Retention Bonus as set forth in the Retention Bonus Agreement that is part of this transaction. Such an event would be a "Business Sale" .... [10]

The Employment Contract therefore establishes a relationship more similar to a partnership than a typical employer/employee relationship.

The equivalent nature of the parties' contributions is further confirmed by the Real Estate Agreement. In that agreement, Talcott granted Haley the right to participate in an option to purchase the property where the Redfin Grill was situated which is located at 1111 Highway One in Bethany Beach, Delaware (the "Property").[11] Talcott had obtained the option personally when the Redfin Grill first leased the Property from the then-owner in February of 2001. Talcott provided this valuable right to participate for the nominal price of $10.00. The agreement provided that if the option were exercised, Haley would shoulder 50% of the burden of the purchase, and would be either a 50% owner of the land or a 50% owner of the entity formed to hold the land.

From late 2001 into 2003, under Haley's supervision, the Redfin Grill grew into a successful business. By the second year of its existence, the start-up money had been repaid to Talcott with interest, both parties were drawing salaries (Talcott's substantially smaller since he was not participating in day-to-day management), and the parties each received approximately $150,000 in profit sharing.

In 2003, the parties formed Matt & Greg Real Estate, LLC to take advantage of the option to purchase the Property that was the subject of the Real Estate Agreement. The option price was $720,000 and the new LLC took out a mortgage from County Bank in Rehoboth Beach, Delaware, for that amount, exercised the option, and obtained the deed to the Property on or about May 23, 2003. Importantly, both Haley and Talcott, individually, signed per-

6. Pl. Ex. 1A at § 1.2.

7. *Id.* at § 3.3.

8. *Id.* at § 8.2.

9. Pl. Ex. 1B.

10. Pl. Ex. 1C.

11. *See* Pl. Ex. 1D.

sonal guaranties for the entire amount of the mortgage in order to secure the loan. The Redfin Grill continued to operate at the site, paying the LLC $6,000 per month in rent, a payment sufficient to cover the LLC's monthly obligation under the mortgage. Thus by mid–2003, the parties appeared poised to reap the fruits of their labors; unfortunately, at that point their personal relationship began to deteriorate.

Haley, having managed the restaurant from the time it opened in May 2001, and having formalized his management position in the Employment Contract, apparently believed that the relationship would be reformulated to provide him a direct stock ownership interest in the Redfin Grill at some point. The reasons underlying that belief are not important here, but in late October they caused a rift to develop between the parties. On or about October 27, 2003, the conflict that had been brewing between the parties led to some kind of confrontation.[12] As a result, Talcott sent a letter of understanding to Haley dated October 27, 2003, purporting to accept his resignation and forbidding him to enter the premises of the Redfin Grill.

Haley responded on November 3, 2003 with two separate letters from his counsel to Talcott. In the first, Haley asserts that he did not resign, and that he regarded Talcott's October 27, 2003 letter of understanding as terminating him without cause in breach of the Employment Contract. Haley goes on to express his intent to pursue legal remedies, an intent that he acted upon in the related case in this court.

In his second November 3, 2003 letter, Haley purported to take several positions expressly as a 50% member in the LLC including: 1) rejecting the new lease proposed by Talcott for the Redfin Grill; 2)

voting to revoke any consent to possession by the Redfin Grill and terminating any lease by which the Redfin Grill asserts the right to possession; and 3) voting that the Property be put up for sale on the open market.

Of course, as a 50% member, Haley could not force the LLC to take action on these proposals because Talcott opposed them. As a result, the pre-existing status quo continued by virtue of the stalemate—a result that Talcott favored. The Redfin Grill's lease has expired and, as a consequence, the Redfin Grill continues to pay $6,000 per month to the LLC in a month-to-month arrangement. The $6,000 rent exceeds the LLC's required mortgage payment by $800 per month, so the situation remains stable. With only a 50% ownership interest, Haley cannot force the termination of the Redfin Grill's lease and evict the Redfin Grill as a tenant; neither can he force the sale of the Property, land that was appraised as of June 14, 2004 at $1.8 million. In short, absent intervention by this court, Haley is stuck, unless he chooses to avail himself of the exit mechanism provided in the LLC Agreement.

That exit mechanism, like judicial dissolution, would provide Haley with his share of the fair market value of the LLC, including the Property. Section 18 of the LLC Agreement provides that upon written notice of election to "quit" the company, the remaining member may elect, in writing, to purchase the departing member's interest for fair market value. If the remaining member elects to purchase the departing member's interest, the parties may agree on fair value, or have the fair value determined by three arbitrators, one chosen by each member and a third chosen

---

**12.** The record contains evidence suggesting the escalating nature of the discussion over restructuring; see, for example, the October 6, 2003 email from Talcott to Haley in response to certain proposals that Haley had presented to Talcott. Pl. Reply Br., Ex. C.

by the first two arbitrators. The departing member pays the reasonable expenses of the three arbitrators. Once a fair price is determined, it may be paid in cash, or over a term if secured by: 1) a note signed by the company and personally by the remaining member; 2) a security agreement; and 3) a recorded UCC lien. Only if the remaining member fails to elect to purchase the departing member's interest is the company to be liquidated.[13]

The LLC agreement describes additional details regarding the term and interest rate of any installment payments and defines penalty, default, and acceleration terms to be contained in the securing note. Although these details are not critical to a comparison between a contractual separation under the LLC Agreement and a judicial dissolution, they demonstrate the level of detail that the parties considered in crafting the exit mechanism. But despite this level of detail, the exit provision does not expressly provide a release from the personal guaranties that both Haley and Talcott signed to secure the mortgage on the Property. Nor does the exit provision state that any member dissatisfied with the status quo must break an impasse by exit rather than a suit for dissolution.

Rather than use the exit mechanism, Haley has simultaneously sought: 1) dissolution of the LLC; and 2) relief in an employment litigation filed against Talcott and Redfin Grill, a case also pending in this court. Haley does not view himself as being obligated by the LLC Agreement to be the one who exits; moreover, he would bear the cost of the exit mechanism and that mechanism, as will be discussed, would not release him from the guaranty.

As a tactical move, Talcott—on the same day as this suit was filed—putatively reinstated Haley as a manager of the Redfin Grill, but with no duties and only $1.00 per year in pay. Talcott claims, however, to recognize Haley's right to 50% of the Redfin Grill profits. It appears that Talcott took this step as a method to preempt relief being granted to Haley by a court in lawsuits that Talcott knew were likely to be imminently filed by Haley. Despite the so-called "reinstatement," Talcott and Haley have not had any direct business contact since October 2003.

Haley has moved on since leaving the Redfin Grill in an active capacity, and now operates another restaurant in Lewes, Delaware. Despite his shift in focus, Haley continues to be interested in the Redfin Grill, and has expressed his desire to buy Talcott out of both the LLC and the Redfin Grill itself if given the opportunity. Talcott, by urging the exit remedy provided in the LLC Agreement, has expressed his desire to buy Haley out of the LLC and has no interest in selling the Redfin Grill. Haley continues to refuse to use the exit mechanism.

Pragmatically, the current impasse arises because we have two willing buyers and no willing sellers. Haley alleges that, given this practical dilemma, and his evident inability to effect his desired direction for the LLC, judicial dissolution is his only practicable remedy.

## II. Procedural History

Haley first filed suit over a year ago.[14] Although some efforts at resolution were

13. LLC Agreement § 18(b)–(e).

14. In addition to his own answer and counterclaim, Talcott also filed a counterclaim on behalf of the LLC, an act that Haley objected to as a 50% owner. In response Haley filed a motion to strike the LLC's pleading with his answer to the counterclaim. After oral argument on the motion, the parties agreed to stipulate that the LLC participates in this litigation as a nominal defendant pending resolution of the ownership interests. On Sep-

made by the parties, Haley moved for summary judgment on June 4, 2004. The matter was briefed and argument occurred on August 25, 2004 by teleconference. After argument, the parties again attempted to resolve the matter, requesting and receiving additional time from the court to do so, but again their negotiations proved unfruitful. The court, by letter dated October 28, 2004, considered Haley's motion for summary judgment submitted and now decides the motion.

### III.  *Legal Analysis*

#### A.  *Procedural Framework*

Haley alleges that pursuant to 6 *Del. C.* § 18–802 the court should exercise its discretion and dissolve the LLC because it is not reasonably practicable for it to continue the business of the company in conformity with the LLC Agreement. Section 18–802 provides in its entirety:

> On application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement.[15]

Haley argues that dissolution is required because the two 50% managers cannot agree how to best utilize the sole asset of the LLC, the Property, because no provision exists for breaking a tie in the voting interests, and because the LLC cannot take any actions, such as entering contracts, borrowing or lending money, or buying or selling property, absent a majority vote of its members. Because this circumstance resembles corporate deadlock, Haley urges that 8 *Del. C.* § 273 provides a relevant parallel for analysis.

The standard Haley must meet to succeed on a motion for summary judgment is clearly established. Haley must establish that no genuine issue of law or of fact exists and that he is entitled to judgment as a matter of law.[16] In examining the record, I must draw every rational inference in Talcott's favor.[17] Here, even if I find that there are no facts under which the LLC could carry on business in conformity with the LLC Agreement, the remedy of dissolution, by analogy to 8 *Del. C.* § 273, remains discretionary.[18]

Here, the key facts about the parties' ability to work together are not rationally disputable. Therefore, my decision on the motion largely turns on two legal issues: 1) if the doctrine of corporate deadlock is an appropriate analogy for the analysis of a § 18–802 claim on these facts; and 2) if so, and if action to break the stalemate is necessary to permit the LLC to function, whether, because of the contract-law foundations of the Delaware LLC Act, Haley should be relegated to the contractual exit mechanism provided in the LLC Agreement.

#### B.  *Case Law Under § 273 Of The Delaware General Corporate Law ("DGCL") Provides An Appropriate Framework For Analysis*

Section 18–802 of the Delaware LLC Act is a relatively recent addition to

---

tember 28, 2004, they entered a stipulation to that effect that resolved the motion to strike.

**15.**  6 *Del. C.* § 18–802.

**16.**  Del. Ct. Ch. R. 56(c); *see Acro Extrusion Corp. v. Cunningham,* 810 A.2d 345, 347 (Del. 2002); *Scureman v. Judge,* 626 A.2d 5, 10 (Del.Ch.1992).

**17.**  *Acro,* 810 A.2d at 347.

**18.**  *See* 6 *Del. C.* § 18–802 (providing that "the Court of Chancery *may* decree dissolution") (emphasis added); *In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc.,* 386 A.2d 1162, 1167 (Del.Ch.1978) (holding that the General Assembly's use of the word "may" in 273(b) clearly indicates that the remedy is discretionary).

our law, and, as a result, there have been few decisions interpreting it. Nevertheless, § 18–802 has the obvious purpose of providing an avenue of relief when an LLC cannot continue to function in accordance with its chartering agreement. Thus § 18–802 plays a role for LLCs similar to the role that § 273 of the DGCL plays for joint venture corporations with only two stockholders. When a limited liability agreement provides for the company to be governed by its members, when there are only two members, and when those members are at permanent odds, § 273 provides relevant insight into what should happen.[19] To wit, Section 273(a) provides, in relevant part, that:

If the stockholders of a corporation of this state, having only 2 stockholders each of whom own 50% of the stock therein, shall be engaged in a joint venture and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture and disposing of the assets used in such venture, either stock holder may, unless otherwise provided in the certificate of incorporation of the corporation or in a written agreement between stockholders, file with the Court of Chancery a petition stating that it desires to discontinue such joint venture and to dispose of the assets used in such venture in accordance with a plan to be agreed on by both stockholders or that, if no such

plan shall be agreed upon by both stockholders, the corporation be dissolved.

Section 273 essentially sets forth three pre-requisites for a judicial order of dissolution: 1) the corporation must have two 50% stockholders, 2) those stockholders must be engaged in a joint venture, and 3) they must be unable to agree upon whether to discontinue the business or how to dispose of its assets.[20] Here, by analogy, each of the three provisions is indisputably met.

First, there is no dispute that the parties are 50% members of the LLC. The LLC agreement provided that both Haley and Talcott would have an initial 50% interest in the LLC. Although the LLC Agreement allows for adjustment to members' capital accounts based on later cash contributions, and a corresponding revision to voting power,[21] neither party asserts that any reconfiguration has occurred. Accordingly, Haley and Talcott each remain 50% members of the LLC.

Second, there is no rational doubt that the parties intended to be and are engaged in a joint venture. While the standard for establishing a joint venture has evolved over time, it has always included the circumstances presented here, where two parties "agree[d] for their mutual benefit to combine their skills, property and knowledge, actively managing the business."[22] The relationship between Haley

**19.** *See In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc.,* 386 A.2d 1162, 1167 (Del.Ch.1978) (recognizing that § 273 exists to provide a speedy method of dissolution for joint venture corporations); *In re English Seafood (USA) Inc.,* 743 F.Supp. 281, 288 (D.Del.1990) (holding that § 273 creates a substantive equitable right that allows a 50% owner to protect his investment).

**20.** *In re Coffee Associates, Inc.,* 1993 WL 512505, at *3 (Del.Ch. Dec.3, 1993); *see generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in*

the *Delaware Court of Chancery,* § 8–11[a][2][i], 8–166—8–178.2 (Release No. 5, February 2004).

**21.** LLC Agreement § 6–10.

**22.** *Wah Chang Smelting & Ref. Co. of America, Inc. v. Cleveland Tungsten Inc.,* 1996 WL 487941, at *6 (Del.Ch. Aug. 19, 1996); *see also J. Leo Johnson v. Carmer,* 156 A.2d 499, 502 (Del.1959) (establishing a very broad and inclusive definition of joint venture); *Warren v. Goldinger Brothers, Inc.,* 414 A.2d 507, 509

and Talcott indicates active involvement by both parties in creating a restaurant for their mutual benefit and profit, and the Employment Contract shows that Haley was to be the "Operations Director" of the Redfin Grill, a position that, according to the Side Letter Agreement, would only be terminated if the restaurant was sold. Haley was also entitled to a 50% share of the Redfin Grill's profits. In short, Haley and Talcott were in it together for as long as they owned the restaurant, equally sharing the profits as provided in the Employment Contract.

Most importantly, Haley never agreed to be a passive investor in the LLC who would be subject to Talcott's unilateral dominion. Instead, the LLC agreement provided that: "no member/managers may, *without the agreement of a majority vote of the managers' interest,* act on behalf of the company." [23] Acts of the company expressly include: borrowing money in the company name; using company property as collateral; binding the company to any obligation such as a guarantor or surety; selling, mortgaging or encumbering any personal or real property of the company except for business purposes for proper consideration; lending company funds; contracting for any debt except for a proper company purpose; and drawing checks on the company account in excess of $5,000.[24] Under these terms, as a 50% member/manager, no major action of the LLC could be taken without Haley's approval. Thus, Haley is entitled to a continuing say in the operation of the LLC.

Finally, the evidence clearly supports a finding of deadlock between the parties about the business strategy and future of the LLC. Haley's second letter of November 3, 2003 expresses his desire to end the lease of the Redfin Grill and sell the Property at fair market value.[25] The very fact that dissolution has not occurred, combined with Talcott's opposition in this lawsuit, leads inevitably to the conclusion that Talcott opposes such a disposition of the assets.[26] Neither is Talcott's opposition surprising given his economic interest in the continued success of the Redfin Grill, success that one must assume relies, in part, on a continuing favorable lease arrangement with the LLC.

Talcott suggests that Haley has merely voluntarily removed himself from the management process and that no express disagreement has arisen.[27] This court, however, may consider the totality of the circumstances in determining whether the parties disagree,[28] and only a rational dispute of fact will preclude the entry of summary judgment. Contrary to Talcott's assertion, it is not, at least in a

---

(Del.1980) (establishing a five step test for joint venture including 1) a community of interest in the performance of a common purpose, 2) joint control or right of control, 3) a joint proprietary interest in the subject matter, 4) a right to share in the profits, and 5) a duty to share in the losses which may be sustained) (quoting *Kilgore Seed Co. v. Lewin,* 141 So.2d 809 (Fla.Dist.Ct.App.1962)).

23. LLC Agreement § 10 (emphasis added).

24. *Id.*

25. Complaint, Ex. H.

26. *See In re McKinney–Ringham Corp.,* 1998 WL 118035, at *4 (Del.Ch. Feb. 27, 1998)

(giving great weight to respondents' opposition to a § 273 petition as evidence of disagreement between the parties); *see also In re Venture Advisers, Inc.,* 1988 WL 127096, at *3 (Del.Ch. Dec.1, 1988) (holding that opposition to a suit, combined with the surrounding circumstance, may be sufficient to establish disagreement even absent direct communication between the parties).

27. Def. Br. at 6–8.

28. *In re Venture Advisers, Inc.,* 1988 WL 127096, at *3 (Del.Ch. Dec. 1, 1988).

§ 273 suit, necessary that the parties formally attempt to reach an agreement before coming to court.[29] In any event, it is clear that, through counsel, the parties have made efforts to resolve this impasse.

Moreover, there is no evidentiary support for Talcott's suggestion that the parties are not at an impasse. The parties have not interacted since their falling out in October, 2003. Clearly, Talcott understands that the end of Haley's managerial role from the Redfin Grill profoundly altered their relationship as co-members of the LLC. After all, it has left Haley on the outside, looking in, with no power. Of course, Talcott insists that the LLC can and does continue to function for its intended purpose and in conformity with the agreement, receiving payments from the Redfin Grill and writing checks to meet its obligations under the mortgage on Talcott's authority. But that reality does not mean that the LLC is operating in accordance with the LLC Agreement. Although the LLC is technically functioning at this point, this operation is purely a residual, inertial status quo that just happens to exclusively benefit one of the 50% members, Talcott, as illustrated by the hands-tied continuation of the expired lease with the Redfin Grill. With strident disagreement between the parties regarding the appropriate deployment of the asset of the LLC, and open hostility as evidenced by the related suit in this matter, it is not credible that the LLC could, if necessary, take any important action that required a vote of the members. Abundant, uncontradicted documents in the record demonstrate the inability of the parties to function together.[30]

For all these reasons, if the LLC were a corporation, there would be no question that Haley's request to dissolve the entity would be granted. But this case regards an LLC, not a corporation, and more importantly, an LLC with a detailed exit provision. That distinguishing factor must and is considered next.

C. *Even Given The Contractual Emphasis Of The Delaware LLC Act, The Exit Remedy Provided In The LLC Agreement Is An Insufficient Alternative To Dissolution*

■ The Delaware LLC Act is grounded on principles of freedom of contract. For that reason, the presence of a reasonable exit mechanism bears on the propriety of ordering dissolution under 6 *Del. C.* § 18–802. When the agreement itself provides a fair opportunity for the dissenting member who disfavors the inertial status quo to exit and receive the fair market value of her interest, it is at least arguable that the limited liability company may still proceed to operate practicably under its contractual charter because the charter itself provides an equitable way to break the impasse.

Here, that reasoning might be thought apt because Haley has already "voted" as an LLC member to sell the LLC's only asset, the Property, presumably because he knew he could not secure sole control of both the LLC and the Redfin Grill. Given that reality, so long as Haley can actually extract himself fairly, it arguably makes sense for this court to stay its hand in an LLC case and allow the contract itself to solve the problem.

■ Notably, reasoning of this nature has been applied in the § 273 context. Even under § 273, this court's authority to

---

**29.** *Id.*

**30.** See, for example, Haley's letter of November 3, 2003 voting his 50% interest in the LLC in favor of terminating the Redfin Grill's lease, removing it from the Property, and selling the Property at fair market value. Complaint, Ex. H.

order dissolution remains discretionary and may be influenced by the particular circumstances.[31] Talcott rightly argues that the situation here is somewhat analogous to that in *In re Delaware Bay Surgical Services* where this court declined to dissolve a corporation under § 273 in part because a mechanism existed for the repurchase of the complaining member's 50% interest.[32]

But, this matter differs from *Surgical Services* in two important respects. First, in *Surgical Services*, the respondent doctor had owned the company before admitting the petitioner to his practice as a 50% stakeholder. The court found that both parties clearly intended, upon entering the contract, that if the parties ended their contractual relationship, the respondent would be the one permitted to keep the company.[33] By contrast, no such obvious priority of interest exists here. Haley and Talcott created the LLC together and while the detailed exit provision provided in the formative LLC Agreement allows either party to leave voluntarily, it provides no insight on who should retain the LLC if both parties would prefer to buy the other out, and neither party desires to leave. In and of itself, however, this lack of priority might not be found sufficient to require dissolution,[34] because of a case-specific fact; namely, that Haley has proposed—as a member of the LLC—that the LLC's sole asset be sold. But I need not—and do not—determine how truly distinguishing that fact is, because forcing Haley to exercise the contractual exit mechanism would not permit the LLC to proceed in a practicable way that accords with the LLC Agreement, but would instead permit Talcott to penalize Haley without express contractual authorization.[35]

Why? Because the parties agree that exit mechanism in the LLC Agreement

---

**31.** *In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc.*, 386 A.2d 1162, 1167 (Del. Ch.1978) (holding that the General Assembly's use of the word "may" in § 273(b) clearly indicates that the remedy is discretionary). I note that there is case law under § 273 suggesting that the court's discretion not to grant dissolution should be applied sparingly, and that, if the plaintiff meets his burden, he essentially secures an equitable right to the relief provided by that provision in the DGCL. See *In re McKinney–Ringham Corp.*, 1998 WL 118035, at *5 (Del.Ch. Feb. 27, 1998) (citing cases). These recommended limitations on judicial discretion under § 273 are arguably less compelling when considering an LLC under § 18–802 because of the contractual focus of the Delaware LLC Act.

**32.** *In re Delaware Bay Surgical Services*, C.A. No. 2121–S (Del.Ch. Jan. 28, 2002) (resolving cross summary judgment motions).

**33.** *Id.* at 5.

**34.** *Cf. Fulk v. Washington Service Associates, Inc.*, 2002 WL 1402273, at *8–14 (Del.Ch. Jun. 21, 2002) (holding that the court may order one 50% holder to sell to the other, in lieu of dissolution, in a § 273 action).

**35.** Stated plainly and putting aside Haley's proposal to sell the Property, it is an interesting question whether the 50% member of an LLC that operates an on-going business, and who does not favor inertial policy, must exit rather than force dissolution, particularly when the cost of the exit procedure would, as here, be borne solely by him. Arguably, it is economically more efficient—absent an explicit requirement that the party disfavoring inertia exit if he is dissatisfied—to order dissolution, and allow both parties to bid as purchasers, with the assets going to the highest bidder (inside or outside) who presumably will deploy the asset to its most valuable use. It is also concomitantly arguable that if parties wish to force the co-equal member disfavoring inertia to exit rather than seek dissolution, then they should explicitly contract upfront in the LLC agreement that exit (or the triggering of a buy-sell procedure, giving incentives for the business to be retained by the member willing to pay the highest value) is the required method of breaking any later-arising stalemate.

would not relieve Haley of his obligation under the personal guaranty that he signed to secure the mortgage from County Bank. If Haley is forced to use the exit mechanism, Talcott and he both believe that Haley would still be left holding the bag on the guaranty.[36] It is therefore not equitable to force Haley to use the exit mechanism in this circumstance. While the exit mechanism may be workable in a friendly departure when both parties cooperate to reach an adequate alternative agreement with the bank, the bank cannot be compelled to accept the removal of Haley as a personal guarantor. Thus, the exit mechanism fails as an adequate remedy for Haley because it does not equitably effect the separation of the parties. Rather, it would leave Haley with no upside potential, and no protection over the considerable downside risk that he would have to make good on any future default by the LLC (over whose operations he would have no control) to its mortgage lender. Thus here, unlike in *Surgical Services,* the parties do not, in fact, "have at their disposal a far less drastic means to resolve their personal disagreement."[37]

### IV. Conclusion

For the reasons discussed above, I find that it is not reasonably practicable for the LLC to continue to carry on business in conformity with the LLC Agreement. The parties shall confer and, within four weeks, submit a plan for the dissolution of the LLC. The plan shall include a procedure to sell the Property owned by the LLC within a commercially reasonable time frame. Either party may, of course, bid on the Property.

IT IS SO ORDERED.

---

**36.** Talcott's counsel was asked to address this factor and her only response was that Haley would share the obligation with Talcott. *See* Letter from A. Robinson to the court of August 26, 2004 ("In light of the fact that both parties personally guaranteed full payment of the LLC Note, it is my client's position that both parties each have a 50% interest in the LLC and the existence of the Guaranties should not affect the ultimate disposition of the LLC's assets.").

**37.** *In re Delaware Bay Surgical Services,* C.A. No. 2121–S, at 5 (Del.Ch. Jan. 28, 2002).