IN THE SUPREME COURT OF NORTH CAROLINA

No. 32PA24

Filed 31 January 2025

JAMES H.Q. DAVIS TRUST and WILLIAM R.Q. DAVIS TRUST

v.

JHD PROPERTIES, LLC, BERRY HILL PROPERTIES, LLC, and CHARLES B.Q. DAVIS TRUST

Appeal pursuant to N.C.G.S. § 7A-27(a) from an order and opinion on cross-motions for summary judgment entered on 14 November 2023, and an amended order and opinion on cross-motions for summary judgment entered on 16 November 2023, by Louis A. Bledsoe III, Chief Business Court Judge, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(a). On 12 April 2024, the Supreme Court allowed intervenor Charles B.Q. Davis Trust's petition for writ of certiorari and petition for writ of supersedeas. Heard in the Supreme Court on 29 October 2024.

*Everett Gaskins Hancock Tuttle Hash LLP, by E.D. Gaskins Jr., James M. Hash, and Andrew M. Simpson, for plaintiff-appellees.*

*Meynardie & Nanney, PLLC, by Joseph H. Nanney Jr., for intervenor-defendant-appellant Charles B.Q. Davis Trust.*

*No brief for defendant-appellants JHD Properties, LLC and Berry Hill Properties, LLC.*

*Jason R. Page for North Carolina Forestry Association, Inc. and Forest Landowner's Association, Inc., amici curiae.*

BARRINGER, Justice.

In this matter, this Court considers whether judicial dissolution under N.C.G.S. § 57D-6-02(2)(i) is an appropriate remedy when the only two managers of two LLCs are at an impasse such that the managers are not able to make decisions regarding the management of the LLCs. Upon careful review, we hold that judicial dissolution is an appropriate remedy in this case as it is "not practicable" for the managers to operate the LLCs in conformance with the operating agreements. Therefore, we conclude that the Business Court did not err in its grant of summary judgment for plaintiffs, and we affirm the amended order and opinion on cross-motions for summary judgment.

## I.    Factual Background

This dispute arises from disagreements between two brothers who manage two LLCs established by their father, Dr. James H. Davis (Dr. Davis). In 2001 and 2002, Dr. Davis established JHD Properties, LLC (JHD) and Berry Hill Properties, LLC (Berry Hill; together with JHD, the LLCs) as part of his estate plan. Additionally, Dr. Davis established four trusts, one for each of his sons, James H.Q. Davis (Jim), William R.Q. Davis (Tad), Jonathon O.Q. Davis (Jon), and Charles B.Q. Davis (Charles). Each of the trusts holds a 25% equity interest in the LLCs. Charles and Jim are the managers of the LLCs. Tad and Jon have no management authority. The LLCs own approximately sixty-eight acres of undeveloped land, comprising four adjacent tracts of land in Wake County, North Carolina (the Property).

Under the nearly identical operating agreements of the LLCs (the Operating

Agreements), neither LLC may take binding action without a majority of the managers coming to an agreement. Since Charles and Jim are the only managers of the LLCs, the Operating Agreements effectively require unanimous agreement of the two managers. According to the Operating Agreements, "[t]he purpose and business of the [LLCs] shall be to engage in the purchase, development, rental, ownership and sale of real property and in any other lawful business for which the limited liability companies may be organized under the Act."

Since the formation of the LLCs, Charles and Jim have cooperated on tasks necessary for maintaining the LLCs, such as making tax payments, preparing Secretary of State filings, financing the LLCs, and selecting and managing the LLCs' accountant. Part of the Property is dedicated to timber, allowing the LLCs to take advantage of some tax benefits available to timber farms. However, the last—and only—timber sale made by the LLCs was in 2004, before Dr. Davis' death.

Only one of the LLCs, Berry Hill, was subject to a forestry management plan. That plan expired in March 2022. Deposition testimony from Charles and Jim indicates their willingness to hire a forestry manager and continue harvesting timber from the Property. However, there is no evidence in the record that either Jim or Charles has pursued an agreement with the other to make that happen. Nor is there evidence of any plan for the LLCs to engage in timbering in the future.

Disagreement between Charles and Jim regarding the use or disposition of the Property has persisted since 2018 or 2019. From 2018 to 2020, Jim and Charles

contemplated using the Property for an agritourism business but could not come to a satisfactory agreement. Subsequently, Jim, Tad, and Jon wished to sell the Property. Charles, however, has consistently opposed the sale of the Property to any outside parties. Charles believed that he had no obligation to consider or approve a sale of the Property, urging the LLCs to "stay the course with their existing businesses, consider new or additional types of business activities, or that the LLCs should negotiate a deal" for him to purchase the Property.

Jim and Charles continued discussing potential options for the future disposition of the Property but were unable to reach any form of agreement over the next two years. By 2020, Jim continued to insist upon selling the Property, while Charles remained committed to his own plan. In April 2020, Charles suggested to Jim that they create a plan to develop the Property. For two months, Jim and Charles discussed proposals, but they never reached agreement. Despite Jim's and Charles' willingness to discuss options, the managers were unable to agree upon even a first step toward development, because Charles insisted upon completing a due diligence investigation first. Jim, on the other hand, wanted to engage with third parties directly before conducting any due diligence.

In October 2021, Jim and Tad wrote to Charles to discuss either selling the Property to Charles or authorizing Jim to sell the Property. In response, Charles sent a nonbinding term sheet to Jim in April 2022. Jim did not engage with the term sheet in any way and instead forwarded a letter of intent from a real estate developer to

Charles in May 2022.

Jim sought Charles' permission to negotiate with the developer, but Charles only responded with a revised term sheet. Charles did not authorize Jim to negotiate with the developer. As a result, the letter of intent expired on 30 June 2022. Jim did not accept Charles' revised term sheet. Instead, Jim sought agreement from Charles to negotiate with the developer again. Charles did not agree. As a result of this inability—for several years—to reach a decision regarding the proper disposition of the Property, there has been no development or active use of the Property.

## II.    Procedural History

On 12 July 2022, plaintiffs James H.G. Davis Trust (the Jim Trust) and William R.Q. Davis Trust (the Tad Trust; together with the Jim Trust, plaintiffs) filed this action against the LLCs, seeking their judicial dissolution under N.C.G.S. § 57D-6-02(2)(i). Plaintiffs contend that it has become "impracticable" to conduct the business of the LLCs due to disagreement between Charles and Jim regarding the disposition and use of the Property and that the LLCs should therefore be judicially dissolved.

On 18 August 2022, the Charles B.Q. Davis Trust (the Charles Trust) filed with the Business Court an unopposed amended motion to intervene as a nominal defendant in this action. The Business Court granted the motion. On 18 October 2022, the Charles Trust filed a motion to dismiss, which the Business Court denied in an order and opinion entered on 9 December 2022.

Plaintiffs and the Charles Trust filed cross-motions for summary judgment on 17 July 2023. Following a hearing on the motions, the Business Court issued an amended order and opinion on cross-motions for summary judgment on 16 November 2023, granting plaintiffs' motion for summary judgment.[1] In granting plaintiffs' motion, the Business Court concluded that the managers of the LLCs were unable to agree

> on the use or disposition of the Property and [were unable] to reach agreement for at least three years, [that] there [was] no mechanism in the Operating Agreements to break the deadlock, [that] the LLCs [had] not conducted any economically useful activity since 2004, and [that] there [was] no way for the LLCs to conduct any business, realize any profit, or dispose of any assets so long as the unbreakable deadlock persist[ed].

Based on these findings, the Business Court concluded that it was not practicable to conduct the LLCs' business in conformance with the Operating Agreements, and therefore, judicial dissolution was appropriate.

## III.    Standard of Review

"On appeal, an order allowing summary judgment is reviewed *de novo.*" *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[1] The Business Court entered an order and opinion on cross-motions for summary judgment on 14 November 2023. Plaintiffs filed a motion for relief due to a clerical error in that order and opinion. The 16 November 2023 order and opinion was entered to correct the clerical error, but it substantively tracks the 14 November order and opinion.

any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2023). A genuine issue is an issue that is "supported by substantial evidence," *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002), and "[a]n issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action," *id.* (alteration in original) (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972)).

"The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

The responding party may not "rest upon the mere allegations or denials" in the pleadings, and its response "must set forth specific facts showing that there is a genuine issue for trial." N.C.G.S. § 1A-1, Rule 56(e). When considering a motion for summary judgment, evidence must be viewed in the light most favorable to the nonmoving party. *Pennington*, 356 N.C. at 579.

The ultimate decision to judicially dissolve an LLC is discretionary. *Chisum v. Campagna*, 376 N.C. 680, 699 (2021). Thus, this Court reviews a lower court's

dissolution of an LLC under N.C.G.S. § 57D-6-02 for an abuse of discretion. *Id.* A lower court's decision to dissolve an LLC will not be overturned for an abuse of discretion "in the absence of a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *Id.* (extraneities omitted).

## IV. Analysis

This Court considers whether the Business Court erred in granting summary judgment to plaintiffs when it determined that the undisputed evidence showed that it is not practicable for the LLCs to conduct business in conformance with the Operating Agreements and therefore, that judicial dissolution is appropriate. For the reasons stated below, we hold that the Business Court did not err.

Under the North Carolina Limited Liability Company Act (the Act), judicial dissolution of a limited liability company is appropriate when "it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and [Chapter 57D] or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member." N.C.G.S. § 57D-6-02(2) (2023).

This Court has considered whether dissolution of an LLC was appropriate under the "not practicable" standard. *See Chisum*, 376 N.C. 680. In *Chisum*, this Court affirmed the Business Court's dissolution of two LLCs based on the following findings of fact:

> a. The [defendants] and [the plaintiff had] no direct
>    contact or communications with one another from

approximately October of 2010, when [the plaintiff] walked out of the [members meeting of a third LLC], and the filing of [the] lawsuit in July 2016.

b. The [defendants] treated [the plaintiff] as if his membership interests in [the LLCs] had been extinguished beginning in July 2012, but never communicated to [the plaintiff] that they considered his memberships terminated. [One of the defendants] admitted [that the plaintiff] did not fail to meet a capital call or take any specific action which would have terminated [the plaintiff's] membership in [one of the LLCs].

c. The [defendants] filed documents with the Secretary of State of North Carolina representing that [one of the LLCs] was dissolved without notifying [the plaintiff], seeking his consent, or making any distribution to [the plaintiff].

d. The [defendants] ceased providing [the plaintiff] with required report and financial information regarding [the LLCs].

e. [The plaintiff's] wife . . . testified that she attempted to visit the [defendants'] offices sometime in 2012–2013 to get information regarding the LLCs, but that [one of the defendants] ordered her to leave the premises in a threatening manner.

*Id.* at 714.

In *Chisum*, the Business Court also noted its observation of the "level of acrimony and distrust between the [defendants] and [the plaintiff was] extraordinary." *Id.* at 714–15. The Business Court was "convinced that these parties could not ever again be associated with one another in a jointly owned business, let alone conduct the business of [the LLCs]." *Id.* at 715. This Court considered those findings of fact as "ample support for a determination that it is not practicable to

conduct the LLCs' business in conformance with the operating agreement and [N.C.G.S. § 57D-6-02(2)]" and that the Business Court "properly ordered the judicial dissolution of the [LLCs] pursuant to clause (i) of N.C.G.S. § 57D-6-02(2)." *Id.* (extraneities omitted).

Even with guidance from *Chisum*, the words "not practicable" remain undefined by statute and by this Court. We take the opportunity to do so now. In its 9 December 2022 order and opinion on the Charles Trust's motion to dismiss, the Business Court considered the meaning of "not practicable." We adopt that reasoning here.

The Business Court began with the standard dictionary definition of "practicable," which Black's Law Dictionary defines as "*reasonably* capable of being accomplished; *feasible* in a *particular* situation." *See Practicable*, Black's Law Dictionary (12th ed. 2024) (emphases added). The Business Court noted that Merriam-Webster and Dictionary.com provide similar definitions as well, defining practicable to mean "capable of being done" or "feasible." *See Practicable*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/practicable (last visited Jan. 10, 2025) (defining "practicable" as "[c]apable of being put into practice or of being done or accomplished: Feasible"); *Practicable*, Dictionary.com, https://www.dictionary.com/browse/practicable (last visited Jan. 10, 2025) (defining "practicable" as "capable of being done, effected, or put into practice, with the available means; feasible"); *see also Practicable*, Merriam-

Webster's Collegiate Dictionary (11th ed. 2003) (defining "practicable" as "capable of being put into practice or of being done or accomplished: feasible").

We agree with the Business Court that, based upon these definitions, "practicable" is synonymous with "feasible" and does not mean simply "possible." Something may be possible but not *feasible* without extra time or resources in a certain circumstance. By that same logic, "not practicable" is synonymous with "unfeasible" and does not mean "impossible." Accordingly, we hold that "not practicable," as used in N.C.G.S. § 57D-6-02(2)(i), means unfeasible.

Courts from other jurisdictions also agree with this interpretation of "not practicable." *See, e.g.*, *Gagne v. Gagne*, 338 P.3d 1152, 1160 (Colo. App. 2014) (concluding that Colorado's "not practicable" standard for judicial dissolution required that the LLC be "unable to pursue the purposes for which the company was formed in a reasonable, sensible, and feasible manner"); *see also Unbridled Holdings, LLC v. Carter*, 607 S.W.3d 188, 197 (Ky. Ct. App. 2020) (noting that if the Kentucky legislature had desired a higher standard for Kentucky's dissolution statute, "it would have used the term 'impossible' instead of 'not reasonably practicable' " and noting that "almost all the outside authorities" permit dissolution under an impracticability standard (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))); *PC Tower Ctr., Inc. v. Tower Ctr. Dev. Assocs. Ltd. P'ship*, Civ. A. No. 10788, 1989 WL 63901, at *6 (Del. Ch. June 8, 1989) (unpublished) (concluding that Delaware's "not reasonably practicable" standard is "one of reasonable practicability, not

impossibility"). Additionally, the Business Court noted that while most states' LLC dissolution statutes provide for dissolution when it is "not *reasonably* practicable" instead of "not practicable," this is a distinction without a difference because the word "practicable" itself connotes reasonableness.

Based on this analysis, the question before this Court is whether the undisputed evidence demonstrates that it is "unfeasible" "to conduct the LLC[s'] business in conformance with the operating agreement[s] and [Chapter 57D]." *See* N.C.G.S. § 57D-6-02(2)(i).

Although *Chisum* offers limited guidance for factually analogous cases, the case before us is distinguishable. Therefore, we take this opportunity to further develop our caselaw as it applies to this case. Therefore, we look to other jurisdictions as instructive in determining what factors to consider here. We first look to the Delaware Court of Chancery on this subject, as their limited liability company dissolution statute allows for dissolution "whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement." Del. Code Ann. tit. 6, § 18-802 (2019).

The Delaware Court of Chancery found judicial dissolution was appropriate when two 50% members were at an impasse and the operating agreement contained no equitable deadlock-breaking mechanism. *Haley v. Talcott*, 864 A.2d 86, 88–89 (Del. Ch. 2004). In *Haley*, the Delaware Court of Chancery explained that "the presence of a reasonable exit mechanism bears on the propriety of ordering dissolution." *Id.* at

96. The Court of Chancery went on to say:

> When the [operating] agreement itself provides a fair opportunity for the dissenting member who disfavors the inertial status quo to exit and receive the fair market value of her interest, it is at least arguable that the limited liability company may still proceed to operate practically under its contractual charter because the charter itself provides an equitable way to break the impasse.

*Id.*

The Delaware Court of Chancery, in an unpublished opinion with facts similar to the case before us, ordered dissolution of an LLC where: "(1) the members' vote [was] deadlocked at the Board level; (2) the operating agreement [gave] no means of navigating around the deadlock; and (3) due to the financial condition of the company, there [was] effectively no business to operate." *In re: GR BURGR, LLC*, C.A. No. 12825-VCS, 2017 WL 3669511, at *5 (Del. Ch. Aug. 25, 2017) (unpublished). In yet another unpublished opinion, the Delaware Court of Chancery concluded that dissolution was appropriate when two managers could not agree on large strategic and operational decisions and the operating agreement provided no equitable means of resolution. *Vila v. BVWebTies LLC*, C.A. No. 4308-VCS, 2010 WL 3866098, at *7 (Del. Ch. Oct. 1, 2010) (unpublished).

Outside of Delaware, other states have also considered what events would make it "not practicable" to operate an LLC. For example, the Colorado Court of Appeals considered several factors when determining whether it was "reasonably practicable to carry on the business of a limited liability company," including:

(1) whether the management of the entity is unable or unwilling reasonably to permit or promote the purposes for which the company was formed; (2) whether a member or manager has engaged in misconduct; (3) whether the members have clearly reached an inability to work with one another to pursue the company's goals; (4) whether there is deadlock between the members; (5) whether the operating agreement provides a means of navigating around any such deadlock; (6) whether, due to the company's financial position, there is still a business to operate; and (7) whether continuing the company is financially feasible.

*Gagne*, 338 P.3d at 1160.

The court noted that "[n]o one of these factors is necessarily dispositive" and that a court does not need to "find that all of these factors have been established in order to conclude that it is no longer reasonably practicable for a business to continue operating." *Id.* at 1161.

Finally, New York courts, under a "not reasonably practicable" standard, have determined that dissolution is appropriate when a party can show that "(1) the management of the entity is unable or unwilling to reasonably permit or promote the stated purpose of the entity to be realized or achieved, or (2) continuing the entity is financially unfeasible." *In re 1545 Ocean Ave., LLC*, 72 A.D.3d 121, 131 (N.Y. App. Div. 2010). The New York intermediate appellate court ultimately concluded that the LLC's operating agreement allowed each managing member to operate unilaterally in furtherance of the LLC's purpose. *Id.* This was sufficient to conclude that no deadlock was present. *Id., see also Mizrahi v. Cohen*, 104 A.D.3d 917, 920 (N.Y. App. Div. 2013) (affirming judicial dissolution of an LLC, because it was not reasonably

practicable for the LLC to continue to operate, as continuing the LLC was financially unfeasible).

Courts in other states have adopted similar factors. In *Venture Sales, LLC v. Perkins*, the Mississippi Supreme Court affirmed the judicial dissolution of a financially solvent LLC. 86 So. 3d 910, 917 (Miss. 2012). The LLC had existed for ten years, with a purpose of developing and selling property. *Id.* at 916. However, the LLC did not have any plans or the financial wherewithal for any development in the near future. *Id.* at 915–16. Thus, the court concluded, dissolution was appropriate, because it was not reasonably practicable for the LLC to carry on in conformity with its operating agreement. *Id.* at 917. In *Kirksey v. Grohmann*, the South Dakota Supreme Court held that judicial dissolution of an LLC was appropriate when no procedure existed in the operating agreement to break existing deadlock. 754 N.W.2d 825, 831 (S.D. 2008). Moreover, the LLC was controlled by and favorable to only 50% of the members. *Id.* Thus, the court concluded, it was not reasonably practicable for the LLC to continue in accord with its operating agreement. *Id.*

We find the aforementioned decisions instructive as we adopt factors and reasoning to establish a clear precedent for what constitutes "not practicable" or "unfeasible" under N.C.G.S. § 57D-6-02(2)(i). Accordingly, to determine whether it is "not practicable" for the managers to continue operating the LLCs, we may consider: (1) whether the management of the company is unable or unwilling to work together to reasonably engage in or promote the purpose for which the company was formed;

(2) whether there is deadlock between the managers;[2] (3) whether the operating agreement provides a means of navigating around such deadlock; (4) whether, due to the company's financial position, there is still a business to operate; (5) whether continuing the company is financially feasible; and (6) whether a member or manager has engaged in misconduct. We are not constrained by any one factor and do not need to find that all of these factors apply to conclude that it is "not practicable" to operate an LLC in accordance with its operating agreement. Instead, we weigh these factors to determine if judicial dissolution is an appropriate remedy.

Applying these factors to this case, this Court agrees with the Business Court and concludes that its decision to dissolve the LLCs was "manifestly [ ]supported by reason" and was "the result of a reasoned decision." *See Chisum*, 376 N.C. at 699 (extraneity omitted). In this case, the evidence demonstrates that it is "not practicable" to operate the LLCs.[3]

> [T]he core factual allegations of [p]laintiffs' Complaint are undisputed and show that the managers cannot agree on the use or disposition of the Property and have not been able to reach agreement for at least three years, there is no mechanism in the Operating Agreements to break the deadlock, the LLCs have not conducted any economically useful activity since 2004, and there is no way for the LLCs to conduct any business, realize any profit, or dispose of any assets so long as the unbreakable deadlock persists.

---

[2] Or members within a member-managed LLC.

[3] We cite to the 16 November 2023 amended order and opinion, in which there was a correction to a clerical error in the 14 November 2023 order and opinion but otherwise substantively tracks with that order and opinion.

*James H.Q. Davis Tr. v. JHD Props., LLC*, 2023 NCBC 78A, 2023 WL 7922656, at *6

(N.C. Super. Ct. Nov. 16, 2023).

As discussed below, while the current operation of the LLCs may be financially

feasible, the inability to achieve the purpose of the LLCs, resulting in deadlock,

demonstrates that dissolution is appropriate here.

**A. The LLCs' Operating Agreements**

The Operating Agreements of the LLCs state that the purpose of the LLCs is

"to engage in the purchase, development, rental, ownership and sale of real property

and in any other lawful business for which limited liability companies may be

organized under the Act." The Business Court determined that this language,

specifically the active language of "development, rental, . . . and sale," indicates an

intent for the Property to be used or sold to maximize its value.

This Court agrees with the Business Court's determination that the purpose

clause of the Operating Agreements shows that the Property was to be used as an

active real estate business in order to maximize its value. First, these LLCs and

trusts were established as estate planning vehicles for a father to pass wealth to his

children. Specifically, the active language in these Operating Agreements—

"purchase, development, rental, ownership and sale"—clearly demonstrate that the

estate plan was intended to be used to provide monetary value to Dr. Davis' sons

through an active real estate business.

The purpose of the LLCs could be achieved through any one of these uses,

-17-

whether developing the land, renting the land to others, or selling the land. The inclusion of the term "ownership" does not defeat the idea that this purpose clause indicates active use, because ownership of property is an essential part of any real estate business.

For these LLCs to engage in active use of the Property, there must at least be an opportunity for the LLCs to develop, rent, sell, or otherwise make use of the land. That purpose does not require the LLCs' land to ultimately be developed or sold. However, at the very least, the LLCs must be able to engage in conversations and negotiations to determine when it is appropriate to develop, rent, or sell.

As the Business Court stated, the "question is not whether the managers are capable of agreement but whether managerial deadlock is preventing the conduct of the LLCs' businesses." Therefore, to hold that it is "not practicable" to operate the LLCs requires evidence of an inability to engage in activities that would allow the LLCs to conduct the LLCs' business; that is, to consider whether they should develop, rent, or sell the land.

## B. Managerial Deadlock

Based on the Operating Agreements, both Jim and Charles must agree for the LLCs to take binding action. Furthermore, the Operating Agreements provide no means of navigating around a deadlock, which can occur anytime the two managers disagree on the proper course of action for the LLCs. Therefore, an inability to reach decisions regarding the operation of the LLCs would evidence a managerial deadlock.

The Charles Trust argues that the evidence displays only one instance of disagreement between the brothers, but the Business Court noted a long record of disagreement and an inability to reach any decisions regarding the disposition or use of the Property. Charles claimed that he has "consistently maintained that [he would] work with [his] brothers" who want to enjoy the benefits of the Property, whether that is through development or sale. However, his actions do not reflect this willingness.

First, Jim and Charles began disagreeing over whether to sell the Property as early as 2018. Additionally, Charles may have engaged in discussions regarding the future of the Property, but he only considered two real outcomes: either they do nothing, or he buys the Property from the LLCs. A willingness to only consider one deviation from the status quo is insufficient to claim that the managers were not deadlocked or that the business was able to properly operate under the Operating Agreements.

Furthermore, Jim and Charles were unable to even reach a consensus on what the first step should be in considering a sale of the Property. Jim wanted to engage directly with third-party developers, while Charles wanted to conduct a thorough due diligence investigation of the Property. Charles insisted upon completing this due diligence investigation before engaging with any outside party. Without Charles' authorization, Jim was unable to even consider negotiations with developers.

By Charles' own admission, he did not believe he had any obligation to consider

a sale of the Property.[4] Charles evidenced this belief when he refused to authorize Jim to negotiate with the developer who submitted the letter of intent. By withholding authorization, Charles stonewalled Jim's ability to engage with third-party developers.

Moreover, Jim's actions indicate that he did not want to engage in a sale of the Property to Charles, evidenced by the fact that Jim completely failed to respond to Charles' term sheet. Jim also stated that he did not trust Charles to actually purchase his and his brothers' interests in the Property. Jim and Charles have both demonstrated an unwillingness to negotiate with the other or even to reasonably consider the offers presented by the other. Jim indicated that he would be willing to consider discussions with Charles regarding an offer to sell the Property to Charles, but that Charles never submitted a binding offer to buy the Property. Finally, mediation between Charles and Jim was unsuccessful and did not break the impasse.

Based on this evidence, the managerial deadlock is preventing the productive conduct of the LLCs' business. Therefore, we affirm the Business Court's decision that it is "not practicable" for the managers to operate the LLCs in accordance with

---

[4] Although it was not argued by the parties and is not before this Court, this admission and the actions of the managers raise a question regarding the fiduciary duties of the managers. Subsection 57D-6-02(2)(ii) allows for dissolution when "liquidation of the LLC is necessary to protect the rights and interests of the member[s]." N.C.G.S. § 57D-6-02(2)(ii). Three of the four brothers favor selling the Property, which means that a majority of the members are interested in selling. Also, as previously discussed, the purpose of the trusts is to actively engage in a real estate business. The interests of the members of an LLC may be an important consideration in the question of dissolution, but it is not determinative here, since the parties did not argue such under N.C.G.S. § 57D-6-02(2)(ii).

the Operating Agreements. Similar to the parties in *Haley*, Jim and Charles are deadlocked, as they are unable to act without the consent of the other. Consequently, they have been unable to make strategic decisions, such as whether to develop or sell the Property, or take operational action, such as getting the Property appraised or hiring a forestry manager, despite having expressed a willingness to do so. *See Haley*, 864 A.2d at 88–89.

While this Court cannot say that it is impossible that the managers could ever operate the LLCs in accordance with the Operating Agreements, the evidence presented demonstrates that continued operation is "unfeasible," which is all that N.C.G.S. § 57D-6-02(2)(i) requires. Although the communications between the managers are cooperative and cordial in tone, there is no evidence of progress toward a reasonable outcome, which would result in any form of active use of the Property. Charles has only proposed two options at this point: to stay the course and not change any use of the land, or to buy the Property, even though he has never provided any firm offer for the Property. On the other side, Jim insists on selling the Property, but his actions indicate that he has no intent to sell the Property to Charles, even when Charles provided a term sheet with a similar purchase price to that of the developer.

Ultimately, the evidence demonstrates that this case satisfies factor one (whether the management of the company is unable or unwilling to work together to reasonably engage in or promote the purpose for which the company was formed) and factor three (whether the operating agreement provides a means of navigating around

such deadlock), discussed above. The managers have been unsuccessful in working with one another to pursue the purpose of the Operating Agreements. The managers are unwilling to engage in active conduct of the LLCs' business. Although both managers have expressed a desire to resolve this disagreement, the actions of both Jim and Charles, in refusing to engage with the business proposals of the other, prove otherwise. Further, the Operating Agreements provide no mechanism to break this deadlock; the requirement of unanimous consent has placed the managers at an unbreakable impasse—implicating factor number two (whether there is deadlock between the managers), discussed above. Moreover, the continued financial feasibility of the LLCs, addressed in factor number five, does not outweigh the deadlock. Notably, the Operating Agreements consider judicial dissolution as an appropriate means for dissolution.[5]

The absence of a mechanism to break the managerial deadlock present under these facts has made it "not practicable" for the managers to operate the LLCs in accordance with the Operating Agreements. According to our analysis, factors one through three weigh in favor of dissolution.

## C. Forestry Business

The Charles Trust argues that the "forestry business" of the LLCs sufficiently

---

[5] The Operating Agreements specify that the LLCs may be dissolved if all or substantially all of the assets are sold, if all members and a majority of the managers consent to dissolution, if a court adjudicates the LLCs to be bankrupt, if the LLCs' terms expire as set forth in the Operating Agreements, or if a court enters a decree of judicial dissolution.

demonstrates that the LLCs are functioning in accordance with the Operating Agreements because forestry makes use of the Property. While this Court agrees with the amici curiae that sound forest management is an economically useful activity, that fact alone does not preclude a conclusion that the managers' deadlock is preventing the LLCs from operating in accordance with their purpose.

First, as discussed above, the managers are deadlocked. This "forestry business" does not change that deadlock. The existing deadlock is preventing the managers from taking any productive steps forward in the development or sale of the land, thus preventing the managers from engaging in any further business, whether forestry or otherwise.

Second, the "forestry business" merely provided the means for more favorable property tax treatment. This alone does not satisfy the requirement that each LLC operates in accordance with its purpose. Only one sale of timber, in 2004, has been made. Only one of the LLCs, Berry Hill, was subject to a forestry management plan; there is no evidence that JHD was subject to a forestry management plan. Only one crop of seedlings has been planted on the Property since the initiation of the forestry management plan. Finally, the LLCs have no current plan to harvest timber. These facts demonstrate that the "forestry business" is not operating in accordance with the purpose of the LLCs.

Third, judicial dissolution may be appropriate when an LLC is "technically function[al]" but operates in a "residual, inertial status quo." *Haley*, 864 A.2d at 96.

In the context of the "forestry business," the Property has only yielded one timber sale, in 2004, before Dr. Davis' death. Furthermore, the managers initially created a forestry management plan, but that plan has since lapsed. The managers have not taken any concrete steps toward instituting a new forestry management plan or hiring a forestry manager. By their own admission, the managers devoted part of the Property to forestry to gain a more favorable tax treatment. Otherwise, the managers have devoted little to no effort to maintain the forestry status.

This Court agrees that forestry management is an economically useful activity and one that should be valued in our state. However, the present facts indicate that the LLCs' business purpose is not being achieved by the present operation. As a result of the managerial deadlock and the lack of evidence indicating that the current "forestry business" fulfills the LLCs' purpose, judicial dissolution is appropriate in this case.

## V.    Conclusion

The undisputed evidence supports the Business Court's decision to dissolve the LLCs. Specifically, the presence of managerial deadlock, the lack of an equitable means of resolving that deadlock, and the unwillingness of the managers to permit the LLCs to engage in and pursue the purpose for which they were formed has rendered the situation such that it is "not practicable" for the managers of the LLCs to operate the LLCs in accordance with the Operating Agreements. Accordingly, we

affirm the Business Court's order and opinion on cross-motions for summary judgment.

AFFIRMED.