EFiled: Aug 25 2017 02:16PM EDT
Transaction ID 61034010
Case No. 12825-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE:  GR BURGR, LLC :
---------------------------------------------- :
GR US LICENSING, LP, :
           :
         Petitioner, :
           :
      v. :
           :      **C.A. No. 12825-VCS**
ROWEN SEIBEL, :
           :
         Respondent. :
           :
---------------------------------------------- :
ROWEN SEIBEL, :
           :
         Respondent and :
         Counterclaim Plaintiff, :
           :
      v. :
           :
GR US LICENSING, LP, :
           :
         Petitioner and :
         Counterclaim Defendant, :
           :
    and :
           :
GR BURGR, LLC, :
           :
         Nominal Defendant. :

## MEMORANDUM OPINION

Date Submitted: June 20, 2017
Date Decided: August 25, 2017

Paul D. Brown, Esquire, Joseph B. Cicero, Esquire and Stephanie S. Habelow, Esquire of Chipman Brown Cicero & Cole LLP, Wilmington, Delaware, and Paul B. Sweeney, Esquire of Certilman Balin Adler & Hyman, LLP, East Meadow, New York, Attorneys for Respondent/Counterclaim Plaintiff Rowen Seibel.

Donald J. Wolfe, Jr., Esquire, Timothy R. Dudderar, Esquire and Jacqueline A. Rogers, Esquire of Potter, Anderson & Corroon LLP, Wilmington, Delaware, and Paul D. Montclare, Esquire and Jacob Albertson, Esquire of Mitchell Silbergerg & Knupp LLC, New York, New York, Attorneys for Petitioner/Counterclaim Defendant GR US Licensing LP.

**SLIGHTS, Vice Chancellor**

Petitioner, GR US Licensing, LP ("GRUS"), has petitioned for judicial dissolution of GR BURGR, LLC ("GRB" or the "Company") pursuant to 6 *Del. C.* § 18-802 ("Section 18-802"). In 2012, GRUS, an entity affiliated with celebrity chef Gordon Ramsay, partnered with Respondent, Rowen Seibel, to form GRB for the purpose of developing and operating first-class burger-themed restaurants. The only revenue-generating business GRB has launched since its formation is reflected in a Development, Operation and License Agreement (the "Caesars Agreement") between GRB and an affiliate of Caesars Entertainment Corporation ("Caesars"), pursuant to which GRB licensed and sublicensed certain trademarks and other intellectual property for Caesars's use in a burger-themed restaurant in the Planet Hollywood Resort & Casino in Las Vegas, Nevada ("Planet Hollywood").

In 2016, Seibel was convicted of a felony tax-related offense. Upon learning of this conviction, Caesars terminated the Caesars Agreement. According to Caesars, any further business relationship with Seibel, or any business with which he is affiliated, would place Caesars in violation of Nevada gaming regulations. In part based on this development, GRUS (and Ramsay) now seek to dissolve GRB and to disassociate from Seibel in order to avoid any further reputational or other harm he might bring to them.

GRUS has moved for judgment on the pleadings. According to GRUS, the facts as admitted by Seibel demonstrate, as a matter of law, that it is no longer

1

"reasonably practicable" for GRB to carry on its business in conformity with its operating agreement and, therefore, dissolution of the entity is appropriate under Section 18-802. For the reasons explained below, I agree. The motion for judgment on the pleadings is GRANTED.

## I. BACKGROUND

I draw the facts from GRUS's Verified Petition for Judicial Dissolution and Declaratory Judgment (the "Petition"), Seibel's Answer to the Petition (the "Answer"), the documents incorporated in these pleadings by reference and facts of which I may take judicial notice.[1]

### A. The Creation, Governance and Business of GRB

GRB is a Delaware limited liability company formed in December 2012 by Ramsay (through his entity GRUS) and Seibel.[2] GRUS and Seibel each own a 50% membership interest in GRB.[3] Each is entitled to designate one manager of GRB;

---

[1] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500, 501 n.40 (Del. Ch. 2000). Without any basis in the Court of Chancery rules or case law, Seibel asserts that I should also accept all facts as pled in his counterclaims as true because GRUS has not answered them. I ruled on January 3, 2017, that I would first address Petitioner's motion for judgment on the pleadings before addressing Seibel's counterclaims, and therefore the relevant pleadings for purposes of this motion are GRUS's Petition and Seibel's Answer.

[2] Answer to Verified Pet. for Judicial Dissolution and Declaratory J. ("Answer") ¶ 5; Verified Pet. for Judicial Dissolution and Declaratory J. ("Pet.") Ex. 1 ("LLC Agreement"), at Recitals.

[3] LLC Agreement, at § 7.2; Answer ¶ 5.

2

GRUS appointed non-party Stuart Gillies and Seibel designated himself.[4]  The LLC Agreement gives the managers the "full and exclusive right, power and authority to manage all of the business and affairs of the Company."[5]  All decisions made by the managers require a majority vote—meaning the two managers must act unanimously.[6]  If the two managers cannot reach unanimous agreement, the LLC Agreement offers no mechanism by which to break that deadlock.[7]  The LLC Agreement provides that GRB will be dissolved upon or under the following events or circumstances: "(a) the LLC ceases its business operations on a permanent basis; (b) the sale or transfer of all or substantially all of the assets of the LLC; (a) [sic] the entry of a decree of judicial dissolution; or (b) [sic] as otherwise determined by the Managers."[8]

---

[4] LLC Agreement, at § 8.2; Answer ¶ 6.

[5] LLC Agreement, at § 8.1.

[6] *Id.*  This is true as to all decisions other than those relating to the License Agreement with GRUS, described below, as to which the LLC Agreement provides: "It is acknowledged that GRUS and the GRUS Manager are interested parties with respect to the License Agreement.  Accordingly, so long as the Company is controlled by GRUS and Seibel, or Seibel, and/or their respective affiliates, any decision to be made by the Company with respect to the License Agreement shall be made by the Seibel Manager acting reasonably and in good faith, unless expressly provided otherwise herein."  *Id.* at § 8.11.

[7] *See generally id.* at § 8.

[8] *Id.* at § 13.1.

GRB's stated business purpose is to own, develop, operate, and license the development of first-class burger-themed restaurants.[9]  Along with the execution of the LLC Agreement, GRB and GRUS executed an agreement whereby GRUS licensed to GRB the trademark "BURGR Gordon Ramsay" (the "License Agreement").[10]  Soon after its formation, GRB developed and is now the sole owner of the trademarks "BURGR" and "GR BURGR."[11]  It also developed the burger restaurant concept, menu and recipes, which along with the trademarks, the LLC Agreement defines as "Company Rights."[12]

On December 13, 2012, GRB entered into the Caesars Agreement with Caesars, pursuant to which GRB provided to Caesars a sublicense to use the name "BURGR Gordon Ramsay," and a license to use certain recipes, menus and other trade property developed by GRB, for use in the "BURGR Gordon Ramsay" restaurant in Planet Hollywood.[13]  In exchange for the sublicense and license,

---

[9] LLC Agreement, at Recitals, § 4.

[10] *Id.* at Recitals; Answer ¶ 5; Transmittal Aff. of Jacqueline A. Rogers in Supp. of Pet'r's Opening Br. in Supp. of its Mot. for J. on the Pleadings ("Rogers Transmittal Aff."), Ex. 1 ("License Agreement").

[11] Answer ¶ 5.  According to Seibel, shortly after the filing of the Petition, beginning on October 19, 2016, and at various times thereafter, Gordon Ramsay has attempted to secure for himself trademark protection for the name "Gordon Ramsay Burger."  Resp't and Countercl. Pl. Rowen Seibel's Req. for Judicial Notice (DI 27) Ex. A–C.

[12] Answer ¶ 5; LLC Agreement, at Recitals.

[13] Pet. Ex. 2 ("Caesars Agreement"), at Recitals, § 6.

4

Caesars agreed to pay GRB license fees based on a percentage of gross restaurant sales and gross retail sales.[14] Since its formation, GRB has engaged in no other revenue-generating business aside from the Caesars Agreement and the corresponding BURGR Gordon Ramsay restaurant in Planet Hollywood.[15] According to Seibel, Ramsay and Caesars have colluded to oust Seibel from GRB and, as a part of this scheme, GRUS has prevented GRB from entering into any other revenue-generating business.[16]

Caesars's businesses are subject to "privileged licenses," including those issued by the Nevada Gaming Commission.[17] Due to certain requirements associated with these licenses, Caesars conditioned the rights and obligations of each party under the Caesars Agreement upon Caesars's satisfaction that GRB and its members, managers and affiliates are not (and do not become) "Unsuitable

---

[14] *Id.* at § 8.1.

[15] Answer ¶ 24 ("Seibel avers that the GRUS, through its controller, Ramsay, prevented the Company from engaging in any other business as part of a concerted effort to oust Seibel from the Company and to self-interestedly secure the value of the Company and its assets for the sole benefit of Ramsay."). *See also id.* at ¶¶ 7, 25.

[16] Answer ¶ 24. In addition to this discord at GRB, Seibel, Ramsay and GRUS have been involved in litigation in New York over another restaurant venture since 2014. *See* Rogers Transmittal Aff. Ex. 2–6 (the operative pleadings in the New York action). The pleadings filed in New York are adjudicative facts of which I take judicial notice for purposes of this motion. *See Permenter v. JP Morgan Chase Bank Nat'l Assoc.*, 2015 WL 8528325, at *1 n.1 (Del. Ch. Dec. 8, 2015).

[17] Caesars Agreement, at § 11.2. *See* NEV. REV. STAT. §§ 463.225, 463.310, 463.360; NEV. GAMING COMM'N REG. 5.045(1), 5.045(6)(a).

Person[s]."[18]  As defined in the Caesars Agreement, "Unsuitable Person" includes

any person "whose affiliation with [Caesars] or its [a]ffiliates could be anticipated

to result in a disciplinary action relating to, or the loss of, inability to reinstate or

failure to obtain" the gaming and alcohol licenses held by Caesars or "who is or

might be engaged or about to be engaged in any activity which could adversely

impact the business or reputation of [Caesars] or its [a]ffiliates."[19]  The Caesars

Agreement further provides that Caesars may make the determination that any

person associated with GRB, its members, managers and affiliates is an "Unsuitable

Person" in its "sole and exclusive judgment."[20]  Upon a determination of

unsuitability,

> (a) Gordon Ramsay and/or GRB shall terminate any relationship with the [p]erson who is the source of such issue, (b) Gordon Ramsay and/or GRB shall cease the activity or relationship creating the issue to [Caesars's] satisfaction, in [Caesars's] sole judgment, or (c) if such activity or relationship is not subject to cure as set forth in the foregoing clauses (a) and (b), as determined by [Caesars] in its sole discretion, [Caesars] shall, without prejudice to any other rights or remedies of [Caesars] including at law or in equity, have the right to terminate [the Caesars Agreement] and its relationship with Gordon Ramsay and GRB.[21]

---

[18] Caesars Agreement, at § 2.2.

[19] *Id.* at § 1.

[20] *Id.* at § 11.2.

[21] *Id.*

6

**B. Seibel is Convicted of Impeding the Administration of the Internal Revenue Code, Causing Caesars to Terminate the Caesars Agreement**

As noted, Seibel pled guilty on April 18, 2016, to a one-count felony criminal information charging him with impeding the administration of the Internal Revenue Code (26 U.S.C. § 7212) after employing an undeclared Swiss bank account and Panamanian shell company to hide taxable income.[22] He was sentenced on August 19, 2016, to one month of imprisonment, six months of home detention and 300 hours of community service in addition to restitution.[23]

Following the sentencing, on September 2, 2016, Caesars sent a letter to GRB, Seibel and Ramsay stating that Seibel's felony conviction rendered him an "Unsuitable Person," and demanding, therefore, that "GRB, [] within 10 business days of the receipt of this letter, terminate any relationship with Mr. Seibel and provide Caesars with written evidence of such terminated relationship."[24] The letter went on to state that "[i]f GRB fails to terminate the relationship with Mr. Seibel,

---

[22] Answer ¶ 10; Rogers Transmittal Aff. Ex. 7, at 15:12–17:19.

[23] Answer ¶ 10; Rogers Transmittal Aff. Ex. 7, at 22:8–21.

[24] Pet. Ex. 3 (stating that "Caesars is aware that Rowen Seibel, who is a GR Associate under the [Caesars] Agreement, has recently pleaded guilty to a one-count criminal information charging him with impeding the administration of the Internal Revenue Code (26 U.S.C. § 7212) (corrupt endeavor to obstruct and impede the due administration of the Internal Revenue Laws), a Class E Felony. Such felony conviction renders Rowen Seibel an Unsuitable Person.").

Caesars will be required to terminate the [Caesars] Agreement pursuant to Section 4.2.5 of the [Caesars] Agreement."[25]

Following receipt of the September 2 letter from Caesars, on September 6, 2016, GRUS sent a letter to Seibel's attorney requesting that Seibel "terminate ***any*** relationship" with GRB and "sign all necessary documents to confirm such termination."[26] In response, Seibel proposed to transfer his interest in GRB to a family trust. Caesars, however, rejected the proposal on September 12, 2016, after it "determined that because the proposed assignees have direct and/or indirect relationships with Mr. Seibel, the proposed assignees are Unsuitable Persons," as defined in the Caesars Agreement.[27] In a letter dated September 12, 2016, GRUS renewed its demand that Seibel completely disassociate from GRB and "fully comply with Caesars' requirements within their timeline."[28] Seibel did not do so.[29]

---

[25] *Id.* Ramsay's attorney also sent Seibel's attorney a letter dated September 2, 2016, stating that he was aware of Seibel's felony conviction and that he expected to receive a notice from Caesars regarding Seibel's unsuitability under the Caesars Agreement, and seeking full disclosure of relevant facts relating to the conviction. Pet. Ex. 4.

[26] Pet. Ex. 5 (emphasis in original).

[27] Pet. Ex. 9. Seibel had first proposed to transfer his membership interest in GRB to his family trust on or about April 11, 2016. Answer ¶ 18. *See also* Pet. Ex. 6.

[28] Pet. Ex. 7.

[29] *See* Pet. Ex. 3–10; Verified Countercls. of Resp't Rowen Seibel Against Pet'r GR US Licensing, LP ("Countercl.") Ex. 1–5 (correspondence between the parties, reflecting no response from Seibel to GRUS's September 12, 2016 letter).

By letter dated September 21, 2016, Caesars terminated the Caesars Agreement because "[a]s of 11:59 p.m. on September 20, 2016, Caesars had not received any evidence that GRB had disassociated with Rowen Seibel, an individual who is an Unsuitable Person, pursuant to the [Caesars] Agreement."[30] Based on the termination of the Caesars Agreement, GRUS sent GRB notice of its termination of the License Agreement on September 22, 2016.[31]

## C. Procedural Posture

GRUS filed its Petition on October 13, 2016, seeking the judicial dissolution and winding up of GRB pursuant to the terms of the LLC Agreement and Section 18-802. On November 23, 2016, Seibel filed his Answer and Verified Counterclaims of Respondent Rowen Seibel Against Petitioner GR US Licensing, LP (the "Counterclaims") in which he asserts: (1) breach of the License Agreement, brought derivatively on behalf of GRB against GRUS; (2) misappropriation and unjust enrichment, brought derivatively on behalf of GRB against GRUS; (3) breach of fiduciary duty, brought directly by Seibel against GRUS; and (4) breach of fiduciary duty, brought derivatively on behalf of GRB against GRUS. These

---

[30] Pet. Ex. 10. Seibel asserts that this purported termination is invalid, *inter alia*, "in that the Caesars Agreement was purported to be terminated by an entity that had assigned all its interests in that Agreement." Answer ¶ 22. This issue is currently before a Nevada court, and has not been joined here.

[31] Countercl. Ex. 5.

9

Counterclaims largely center on Seibel's allegations that Ramsay, through GRUS, has sought to usurp corporate opportunities from GRB and Seibel, primarily via a collusive plot with Caesars to terminate the Caesars Agreement based on the "fiction" that Seibel's conviction renders him an "Unsuitable Person."[32]

On December 13, 2016, GRUS moved for judgment on the pleadings on its Petition (the "Motion"). At the same time, GRUS moved to dismiss, or in the alternative, stay or sever Seibel's Counterclaims. In a telephonic scheduling conference on January 3, 2017, the Court ruled that it would decide GRUS's Motion on the dissolution claims before addressing GRUS's motion to dismiss the Counterclaims. The Court also entered an order staying discovery.

On January 17, 2017, GRUS moved to expedite the proceeding with respect to the motion *sub judice* due to the filing of derivative claims by Seibel on behalf of GRB in Nevada (the "Nevada Action") in which Seibel, *inter alia*, challenges the termination of the Caesars Agreement and seeks specific performance of that agreement. The motion to expedite was denied in a telephonic hearing on January 23, 2017. Thereafter, Seibel moved for a preliminary injunction in Nevada to prevent Caesars from taking any action in furtherance of its decision to terminate the Caesars Agreement. That motion was denied without prejudice on March 22,

---

[32] *See* Countercl. ¶¶ 1–6 (describing the nature of the Counterclaims).

2017.[33]   The Nevada court granted a partial motion to dismiss Seibel's claims without prejudice on May 17, 2017,[34] and Seibel filed an amended complaint in that action shortly after.[35]   On June 20, 2017, the parties supplemented the record in connection with the motion *sub judice*, at the Court's request, by submitting orders and transcripts of certain court rulings in the Nevada litigation.

## II.  ANALYSIS

GRUS's motion for judgment on the pleadings requires the Court to determine whether the uncontested facts as admitted by Seibel in his Answer entitle GRUS to judicial dissolution of GRB as a matter of law.  For the reasons that follow, I find that the deadlock between the parties, as evidenced by the undisputed facts, has rendered it no longer reasonably practicable for GRB to operate in accordance with its LLC Agreement.  I also find no basis in equity to deny dissolution.  I explain these findings below after addressing the standard of review.

---

[33] Ltr. from Paul D. Brown to Vice Chancellor Joseph R. Slights III in resp. to his ltr. dated June 19, 2017 regarding the Nevada action ("Supplemental Ltr.") (DI 37) Ex. A, B.

[34] *Id.* at Ex. C, D.

[35] Resp. Rowen Seibel's Ltr. to Vice Chancellor Joseph R. Slights III Regarding Filing of Am. Compl. in Nevada State Ct. Action (DI 38).

## A. Standard of Review for Judgment on the Pleadings

Under Court of Chancery Rule 12(c), the Court may grant a motion for judgment on the pleadings if, when viewing the claims in the light most favorable to the nonmoving party, there are no material issues of fact and the movant is entitled to judgment as a matter of law.[36]  As the Motion was brought by Petitioner, facts admitted in the Answer are deemed true.[37]

## B. Judicial Dissolution of an LLC Pursuant to 6 *Del. C.* § 18-802

GRB's LLC Agreement allows for dissolution of the Company pursuant to a judicial decree of dissolution under Section 18-802 which, in turn, provides that "[o]n application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[38]

---

[36] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).  Seibel contends that the present Motion is premature because GRUS filed a motion to dismiss the Counterclaims, leaving them unanswered.  I note first that Seibel did not raise (or even preview) this argument during the teleconference on January 3, 2017, where I addressed GRUS's application to proceed with the motion for judgment on the pleadings in summary fashion before turning to the Counterclaims.  But more importantly, the relevant pleadings—*i.e.*, those relating to GRUS's dissolution claims— are closed, making it appropriate to rule on the Motion.  *Cf. Vale v. Atlantic Coast & Inland Corp.*, 99 A.2d 396, 397–400 (Del. Ch. 1953) (holding that a motion for judgment on the pleadings was premature because the pleadings were not closed where the defendant had moved to strike the complaint rather than answer it, a motion which the court subsequently treated as a motion to dismiss).

[37] *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Ch. 1989).

[38] 6 *Del. C.* § 18-802.

12

The "not reasonably practicable" standard does not require a petitioner to "show that the purpose of the limited liability company has been 'completely frustrated.'"[39] Rather, "[t]he standard is whether it is reasonably practicable for [the company] to continue to operate its business in conformity with its LLC Agreement."[40] Our law provides no blueprint for determining whether it is "not reasonably practicable" for an LLC to continue, but "several convincing factual circumstances have pervaded the case law: (1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate."[41] None of these factors are "individually dispositive; nor must they all exist for a court to find it no longer reasonably practicable for a business to continue operating."[42] While judicial dissolution of an LLC is a "discretionary remedy" that is "granted sparingly," "it has been granted 'in situations where there was 'deadlock'

---

[39] *Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4 (Del Ch. Jan. 13), *aff'd*, 984 A.2d 124 (Del. 2009). *See also PC Tower Ctr., Inc. v. Tower Ctr. Dev. Assocs. Ltd. P'ship*, 1989 WL 63901, at *6 (Del. Ch. June 8, 1989) (noting that the "not reasonably practicable" standard "is one of reasonable practicality, not impossibility").

[40] *Fisk*, 2009 WL 73957, at *4.

[41] *Id.*

[42] *Id.*

that prevented the [entity] from operating and where the defined purpose of the entity was . . . impossible to carry out.'"[43]

In setting up his argument that dissolution should not be ordered in this case, Seibel relies on this court's opinion in *In re Arrow Investment Advisors, LLC*,[44] and argues that "[i]n applying only the undisputed facts to the law, the Court should also bear in mind that dissolution is an 'extreme' remedy of 'last resort' and that the Court's statutory power to order dissolution is 'limited.'"[45] In doing so, he has only partially set the table because, while he quotes *Arrow Investment* correctly, he has not quoted it completely. After discussing the "limited" nature of the court's power to dissolve a Delaware entity, the court went on to explain the impact of management dysfunction and deadlock on the dissolution analysis:

> The court will not dissolve an LLC merely because the LLC has not experienced a smooth glide to profitability or because events have not turned out exactly as the LLC's owners originally envisioned; such events are, of course, common in the risk-laden process of birthing new entities in the hope that they will become mature, profitable ventures. In part because a hair-trigger dissolution standard would ignore this market reality and thwart the expectations of reasonable investors that entities will not be judicially terminated simply because of some market turbulence, *dissolution is reserved for situations in which the LLC's management has become so dysfunctional or its business purpose so*

---

[43] *Meyer Natural Foods LLC v. Duff*, 2015 WL 3746283, at *3 (Del. Ch. June 4, 2014) (quoting *In re Seneca Invs. LLC*, 970 A.2d 259, 262–63 (Del. Ch. 2008)).

[44] 2009 WL 1101682 (Del. Ch. Apr. 23, 2009).

[45] Resp't's Answering Br. in Opp'n to Mot. for J. on the Pleadings ("Resp't's Answering Br.") 17 (quoting *Arrow Inv. Advisors*, 2009 WL 1101682, at *2, 5).

*thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill.*[46]

As discussed below, Seibel has failed to account for the fact that he and Ramsay no longer speak and no longer make decisions for GRB. This dysfunction and voting deadlock has left the Company in a petrified state with no means in the LLC Agreement to break free.

Seibel also argues that equity should step in to prevent the dissolution of GRB even if the Court finds that it is "not reasonably practicable" for the Company to carry on its business in conformity with the LLC Agreement because "where one LLC member pursues dissolution to usurp a business opportunity or where he seeks to disenfranchise other LLC members for his personal and sole benefit, the requested dissolution should be denied."[47] Seibel's appeal to equity to prevent a dissolution of GRB rings hollow, however, because the circumstance that has created the deadlock and the resulting need for dissolution is of his own making.

## C. Insurmountable Deadlock at GRB Justifies Judicial Dissolution

GRUS's "primary legal argument supporting [its] request for judicial dissolution of GRB . . . is that the two 50% owners of GRB—GRUS and Seibel—

---

[46] *Arrow Inv. Advisors*, 2009 WL 1101682, at *2 (emphasis added).

[47] Resp't's Answering Br. 19 (citing *Xpress Mgmt. v. Hot Wings Int'l, Inc.*, 2007 WL 1660741, at *6 (Del. Ch. May 30, 2007)).

are deadlocked as to the management of the Company and the Company's LLC Agreement provides no means for resolving that deadlock."[48]  In the context of judicial dissolution, "[d]eadlock refers to the inability to make decisions and take action, such as when an LLC agreement requires an unattainable voting threshold."[49]

Where there are two 50% owners of a company, an unbreakable deadlock can form a basis for dissolution even if the company is still engaged in marginal operations.[50]  In this regard, the decision in *Haley v. Talcott*[51] is instructive.  There, on a motion for summary judgment, the court ordered judicial dissolution of a LLC pursuant to Section 18-802 upon concluding that there was "deadlock between the parties about the business strategy and future of the LLC"[52] with no reasonable exit mechanism, rendering the LLC unable to "function[] as provided for in the LLC Agreement."[53]  The company's only asset was a piece of real estate leased to a restaurant, and the parties could not agree about what to do with that land—one

---

[48] Pet'r's Reply Br. in Supp. of its Mot. for J. on the Pleadings ("Pet'r's Reply Br.") 5.

[49] *Meyer*, 2015 WL 3746283, at *3.

[50] *See Phillips v. Hove*, 2011 WL 4404034 (Del. Ch. Sept. 22, 2011); *Vila v. BVWebTies LLC*, 2010 WL 3866098 (Del. Ch. Oct. 1, 2010); *Haley v. Talcott*, 864 A.2d 86 (Del. Ch. 2004).

[51] 864 A.2d 86 (Del. Ch. 2004).

[52] *Id.* at 95

[53] *Id.* at 89.

16

wanted to continue the lease with the restaurant and the other wanted to end the lease and sell the property.[54] The two members had not interacted since a falling out and were engaged in other litigation relating to the LLC.[55]

In analyzing the dispute, the court drew parallels between Section 18-802 and 8 *Del. C.* § 273 ("Section 273"), which governs the dissolution of joint venture corporations with two 50% owners.[56] Section 273 "sets forth three pre-requisites for a judicial order of dissolution: 1) the corporation must have two 50% stockholders, 2) those stockholders must be engaged in a joint venture, and 3) they must be unable to agree upon whether to discontinue the business or how to dispose of its assets."[57] The court found, by analogy, that all three of these pre-requisites were met where

---

[54] *Id.* at 95.

[55] *Id.* at 96.

[56] *Id.* at 93–96. The court has, on other occasions, analogized the judicial dissolution of an LLC with two 50% owners under Section 18-802 to the 50/50 deadlock scenario addressed by Section 273, noting that "[t]he reason that the § 273 analysis is useful in the LLC context is obvious: when an LLC agreement requires that there be agreement between two managers for business decisions to be made, those two managers are deadlocked over serious issues, and the LLC agreement provides no alternative basis for resolving the deadlock, it is not 'reasonably practicable' to continue to carry on the LLC business '*in conformity* with [its] limited liability company agreement.'" *Vila*, 2010 WL 3866098, at *7 (quoting 6 *Del. C.* § 18-802) (emphasis in original). *See also id.* at *8 (ordering dissolution after a trial where the two 50% owners were deadlocked, noting that "a deadlock would not necessarily justify a dissolution if the LLC Agreement provided a means to resolve it equitably" but the LLC agreement did not contain means to break a deadlock and, instead, provided that the members could seek judicial dissolution).

[57] *Haley*, 864 A.2d at 94 (citing *In re Coffee Assocs., Inc.*, 1993 WL 512505, at *3 (Del. Ch. Dec. 3, 1993)).

the parties were 50% members of the LLC, the parties intended to be and were engaged in a joint venture and the parties were at an impasse regarding how best to manage the LLC's lone asset.[58] In so holding, the court noted that while the business was "technically functioning, this operation is purely a residual inertial status quo," and further noted that it was "not credible that the LLC could, if necessary, take any important action that required a vote of the members."[59] Therefore, after determining that the exit provision in the LLC agreement was not an adequate remedy in lieu of judicial dissolution, the court granted dissolution pursuant to Section 18-802 because it was "not reasonably practicable for the LLC to continue to carry on business in conformity with the LLC Agreement."[60]

Here, GRUS and Seibel are both 50% owners of GRB,[61] each is entitled to appoint one manager,[62] all decisions of the managers must be unanimous besides those relating to the License Agreement,[63] and the LLC Agreement does not provide

---

[58] *Id.* at 94–95.

[59] *Id.* at 95. Specifically, the court found that "[w]ith strident disagreement between the parties regarding the appropriate deployment of the asset of the LLC, and open hostility as evidenced by the related suit in this matter, it is not credible that the LLC could, if necessary, take any important action that required a vote of the members." *Id.*

[60] *Id.* at 98.

[61] LLC Agreement, at § 7.2.

[62] *Id.* at § 8.1.

[63] *Id.* at §§ 8.1, 8.11. Seibel argues that the LLC Agreement gives him "exclusive authority" to make decisions "with respect to the License Agreement." Resp't's Answering

any mechanism to break a voting deadlock. The undisputed facts reveal that the relationship between GRUS and Seibel is, at best, acrimonious, as evidenced by the Counterclaims here, the Nevada Action and the litigation proceedings in New York stemming back to 2014.[64] While the working relationship between the parties arguably had broken down prior to Seibel's felony conviction in 2016, the facts as admitted in the pleadings show clearly that whatever deadlock may have arisen prior to Seibel's conviction solidified to igneous rock thereafter.

Seibel was convicted and sentenced for impeding the administration of the Internal Revenue Code. Then, Caesars declared Seibel an "Unsuitable Person" and ordered GRB and GRUS to disassociate from him. When GRUS sought to comply with Caesars's direction by having Seibel voluntarily separate from GRB, Seibel refused. When Seibel proposed, as a compromise, that he would transfer his interest

---

Br. 32 (quoting LLC Agreement, at § 8.11). His argument follows that "[d]eadlock most decidedly cannot exist where the LLC Agreement grants one managing member exclusive authority." *Id.* (citing *Meyer*, 2015 WL 3746283, at *4). GRUS disputes Seibel's interpretation of the LLC Agreement and whether it gives him all the power over the License Agreement that Seibel claims it does. Pet'r's Reply Br. 9–10. It is unnecessary to resolve this dispute, however, because regardless of whether Seibel has the authority to make decisions regarding the License Agreement alone, there are myriad other decisions that would need to made in running the business that would require unanimity and, as discussed below, "it is not credible that [GRB] could, if necessary, take any important action that required a vote of the members." *Haley*, 864 A.2d at 96.

[64] The New York proceedings center around another joint restaurant venture between Seibel and Ramsay in Los Angeles called Fat Cow. *See* Rogers Transmittal Aff. Ex. 2–6. There, both Seibel and Ramsay allege breach of contract and fiduciary duty on the part of the other, and Ramsay additionally alleges that Seibel has engaged in fraud. *Id.*

in GRB to a family trust, GRUS and Caesars both indicated that this was inadequate to cure the "Unsuitable Person" problem. When Caesars learned that Seibel remained at GRB after its disassociation deadline passed, it terminated the Caesars Agreement. It is difficult to imagine how GRB could be any more dysfunctional or deadlocked.[65]

Given these undisputed facts, the notion that the deadlock might somehow be broken in the future is simply not reasonably conceivable. Ramsay, and his entity GRUS, no longer want to be associated with Seibel due to his felony tax-related conviction and the reputational damage that will flow from their continued connection with him. This circumstance will not change as future events unfold. It also distinguishes this case from the legion Delaware authority cited by Seibel to the effect that a party cannot seek dissolution simply to extricate himself from what he considers to a "bad deal."[66] Here, GRUS and Seibel elected to do business together in the form of GRB, each presuming that the other was an honorable actor. This

---

[65] *See Haley*, 864 A.2d at 96 (finding deadlock where there was "strident" disagreement over how to manage the asset of the LLC and open hostility between two 50% members of an LLC).

[66] *See, e.g.*, *Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2010 WL 3314484, at *24 (Del. Ch. Aug. 2, 2010) (citing cases and holding that dissolution was not warranted where the petitioner's "frustration amounts to little more than disappointment with how [the company] is structured and managed" because "[u]nfortunately for [the petitioner], it agreed to this arrangement," and "emphasizing that a party to a limited liability company agreement may not seek judicial dissolution simply as a means of freeing itself from what it considers a bad deal").

20

presumption was shattered when Seibel was convicted of a felony, especially one involving dishonesty. Tax fraud is not a Las Vegas moment.[67] It should come as no surprise to Seibel that his conduct leading to that conviction will have consequences (here, as relates to GRB) that extend beyond his conviction and sentencing. This is especially so given that GRB's only revenue-generating business was in a casino, an enterprise that GRUS, Seibel and GRB knew was highly regulated.[68]

Whether right or wrong, Caesars has determined in its "sole judgment" that Seibel is an "Unsuitable Person," a consequence from GRUS and GRB's perspective that is entirely of Seibel's own doing. GRUS finds itself in a lifeless joint venture that does not resemble the one it bargained for.[69] The undisputed facts reveal that the parties will remain deadlocked without a mechanism in the LLC Agreement to

---

[67] "What happens in Vegas stays in Vegas" (The Las Vegas Convention and Visitors Authority 2003).

[68] *See* Caesars Agreement, at § 11.2.

[69] In attempting to dissolve GRB, GRUS (and Ramsay) are not simply trying to walk away from a "bad deal"; they are attempting to disassociate from a person who has engaged in post-formation conduct that could bring them reputational and other harm. Trust between the joint venturers is shattered; they cannot agree on anything; and it is time for them to separate.

break through.[70]  It is, therefore, "not reasonably practicable" for GRUS and Seibel

to carry on GRB "in conformity with [the] limited liability company agreement."[71]

---

[70] The facts relating to the parties' hopeless deadlock following Seibel's felony conviction are undisputed and admitted by Seibel in his Answer.  Answer ¶¶ 10, 16–22.  There is, therefore, no need for discovery relating to these facts and, of course, no need for a trial to resolve material factual disputes.

[71] 6 *Del. C.* § 18-802.  *See Fisk*, 2009 WL 73957, at \*4 (holding that dissolution under Section 18-802 was warranted on petitioner's motion for judgment on the pleadings where "deadlock prevents the limited liability company from operating or furthering its stated business purpose, [meaning that] it is not reasonably practicable for the company to carry on its business").  While I have found that the undisputed deadlock present at GRB justifies judicial dissolution of GRB as a matter of law, I note that GRUS also argues that dissolution is appropriate because the business is unable to continue.  According to GRUS, GRB has ceased to do business because the only revenue-generating business it had, the Caesars Agreement, was terminated by Caesars.  *See* Pet'r's Opening Br. 24.  Seibel cites to several open issues that he argues preclude a judgment on the pleadings on this ground, including his allegation that the BURGR Restaurant in Planet Hollywood "continues to operate, under a virtually identical concept, with virtually identical menus and look, and thereby generates significant profit utilizing GRB's intellectual property, but without remitting any license fees or other profits to GRB," and that, under the Caesars Agreement, GRB should have the right to license fees from that new restaurant.  Resp't's Answering Br. 29–30 (citing to the Counterclaims).  Claims also remain in the Nevada Action for breach of the Caesars Agreement, including a prayer for specific performance of that contract.  *See* Supplemental Ltr. Ex. A–D.  I agree with Seibel that questions of fact remain regarding whether GRB might be able to engage in some form of business in the future that preclude a ruling at this stage that dissolution is appropriate because GRB is no longer in business.  This, of course, does not preclude a judgment of dissolution on the alternative ground that it is no longer reasonably practicable to carry on the business of GRB given the intractable deadlock of its members.  *See Haley*, 864 A.3d at 96 (holding that irreconcilable deadlock between two 50/50 members of an LLC was sufficient to warrant dissolution pursuant to Section 18-802 even where the LLC had remaining residual business operations).

**D. Equitable Principles do not Override the fact that Judicial Dissolution is Warranted**

Seibel argues that even if GRUS has satisfied the "not reasonably practicable" standard for dissolution, the Court should decline to order dissolution at this pleadings stage as a matter of equity. He correctly points out that Section 18-802 provides that the court "may" grant dissolution where it is no longer reasonably practicable for the company to continue to operate in accordance with its operating agreement; the General Assembly appears deliberately to have chosen not to mandate that result.[72] According to Seibel, the Court should invoke equity to deny the Petition because the dissolution is "being exploited tactically for an ulterior and inequitable purpose . . . [because GRUS is] pursu[ing] dissolution to usurp a business opportunity . . . [and] seeks to disenfranchise [the] other LLC member[] for [Ramsay's] personal and sole benefit."[73] Specifically, Seibel alleges that:

> Ramsay's currently undisputed plan, which includes dissolution of GRB, is expressly designed to usurp GRB's entire BURGR Restaurant business by interfering with GRB's ability to pursue its business purpose. . . . Ramsay and Petitioner refused to consider additional corporate opportunities for GRB, or to meet with Seibel to discuss the potential opportunities, beginning in 2013. Ramsay then attempted to

---

[72] *See* 6 *Del. C.* § 18-802. *See also In re Mobilactive Media, LLC*, 2013 WL 297950, at *33 (Del. Ch. Jan. 25, 2013) ("Yet, even in cases where the standard for dissolution has been met, the Court of Chancery, in the exercise of its equitable powers, *may* decide whether it should issue a decree of dissolution."); *Lola Cars*, 2010 WL 3314484, at *22 ("[A]s the statute makes clear, even if the standard of 'not reasonably practicable' is met, the decision to enter a decree of dissolution nonetheless rests with the discretion of the Court.").

[73] Resp't's Answering Br. 19 (citing *Xpress Mgmt.*, 2007 WL 1660741, at *6).

solidify his ability to continue the burger restaurant concept for himself by attempting to register the 'BURGR' trademark in one of his other entities, despite the LLC Agreement and the License Agreement Petitioner signed acknowledging that the BURGR name was owned by GRB. Then, on April 7, 2016, Ramsay instructed [Caesars] to remit monies due under the [Caesars Agreement] directly to Petitioner, as opposed to the GRB, in contravention of the [Caesars Agreement] and the LLC Agreement.

Ramsay then colluded with [Caesars] to terminate the [Caesars Agreement], which then permitted Ramsay to terminate the License Agreement, thereby depriving GRB of two of its three principal assets: the [Caesars Agreement] under which the BURGR Restaurant operated in the Planet Hollywood hotel, and the License Agreement under which the BURGR Restaurant was marketed under the Gordon Ramsay name. Viewed in the light most favorable to Seibel, and prior to any discovery, the pleadings establish that Ramsay and [Caesars] decided to enable Ramsay to obtain the full profits of the BURGR Restaurant by contriving an unsubstantiated finding that Seibel was an 'unsuitable' person. Ramsay and [Caesars] then rejected all efforts by Seibel to ameliorate and cure any perceived basis for an unsuitable person finding. And then based upon the contrived unsuitable person determination, the [Caesars Agreement] and, in turn, the License [Agreement] were terminated. GRB was deprived of these valuable assets without remuneration, but without depriving Ramsay or [Caesars] from continuing to market and operate the BURGR Restaurant in the Planet Hollywood hotel—which they have done and which has remained profitable.[74]

Given this history, Seibel maintains that "[e]quity 'should not stand idle' . . . where the purpose of the dissolution is to aid the Petitioner in exploiting GRB's entire

---

[74] Resp't's Answering Br. 22–23 (citations omitted). Notably, the citations that Seibel provides for these facts all lead to his Counterclaims, not the pleadings relevant to the Petition for dissolution. I will consider these facts, nevertheless, in order to address Seibel's equitable argument on the merits.

business for itself (or for its principal), and thus dissolution should be denied at this stage of the proceedings."[75]

Seibel relies primarily upon this court's decisions in *In re Mobilactive Media, LLC*[76] and *Xpress Management v. Hot Wings International, Inc.*[77] as support for the proposition that "equity" should step in to prevent the dissolution of GRB. In *Mobilactive Media*, the court rendered a post-trial decision finding the defendant liable for breach of fiduciary duties. The court then addressed defendant's petition for dissolution and summarily denied it upon concluding that the defendant was proffering the consequences of its own breach of fiduciary duty (the usurpation of corporate opportunities) as the primary basis for its argument that the business could no longer fulfill its designated purpose.[78] Specifically, the court held that the defendant "should not be permitted to use its inequitable conduct to extricate itself from what it has long considered to be a bad deal with [plaintiff] and [the company] and simultaneously hinder [plaintiff] from recovering the damages he is due."[79] Importantly, the court was concerned that the defendant was seeking to dissolve the

---

[75] *Id.* at 24

[76] 2013 WL 297950 (Del. Ch. Jan. 25, 2013).

[77] 2007 WL 1660741 (Del. Ch. May 30, 2007).

[78] *Mobilactive Media*, 2013 WL 297950, at *33.

[79] *Id.*

25

entity before the defendant had paid the damages to the entity that the court had just ordered the defendant to pay for breaching his fiduciary duty.[80] Needless to say, no such concern exists here.

In *Xpress Management*, the court granted a motion to stay a dissolution proceeding brought under 8 *Del. C.* § 273 in favor of prior-filed litigation between the parties.[81] While the court acknowledged that pre-existing litigation between parties generally will not prevent a member of a joint venture from seeking dissolution under Section 273, "when the other party can point to uncontested facts which raise a specter of bad faith conduct by the party seeking dissolution, the Court of Chancery's inherent equitable discretion should not stand idle."[82] In this regard, the court found the uncontested facts—that the petitioner repeatedly sought to break up the subject company via litigation in various other fora for improper and self-interested reasons—raised an inference that the petitioner was seeking to exploit future business opportunities rightfully belonging to the venture it was seeking to dissolve.[83] As the court explained, "a court should be wary when section 273 is invoked as a statutory panacea by a purported joint venture who, having failed before

---

[80] *Id.*

[81] 2007 WL 1660741, at *7.

[82] *Id.* at *6.

[83] *Id.*

26

in its effort to break up the company and having eschewed the power of this court for so long, suddenly maintains that a rapid and summary dissolution is the appropriate method through which the corporation's best interests will be served."[84]

Seibel has pointed to nothing that would suggest that GRUS sought to dissolve or walk away from GRB prior to Seibel's conviction for tax fraud and Caesar's subsequent termination of the Caesar's Agreement. Unlike the petition at issue in *Xpress Management*, the Petition at issue here is not the latest act in a long-playing drama where one member of a joint venture gins up any excuse imaginable to separate from the other. The deadlock here is temporally related to a series of events, caused by Seibel, that have rendered GRB no longer able to function.

A case not cited by Seibel, *In re Data Processing Consultants, Ltd.*,[85] is especially informative in its discussion of the scope and utility of the court's equitable powers in the dissolution context. There, the court acknowledged that Section 273 allows the court to decline to order dissolution on equitable grounds even when the petitioner satisfies the statutory criteria for dissolution, but only in "narrow" circumstances where the petitioner has engaged in demonstrable "bad faith in the seeking of [] dissolution."[86] The court emphasized that "such [equitable]

---

[84] *Id.* at *7.

[85] 1987 WL 25360 (Del. Ch. Nov. 25, 1987) (Allen, C.).

[86] *Id.* at *4 (providing, as an example, that "this court might deny such a petition upon a showing that one joint-venturing shareholder seeks dissolution at a particular time in order

27

power should be sparingly exercised."[87]  Citing *Data Processing*, this court has since illustrated the limited reach of the bad faith exception, ordering dissolution and the appointment of a receiver under Section 273 even in the face of allegations that the petitioner had engaged in past instances of usurpation of corporate opportunities because such instances did not adequately portend "specific future" harm that would justify perpetuating a dysfunctional joint venture.[88]

to free himself to exploit a specific future business opportunity personally that would rightfully belong to the company if it should happen to continue to exist as a going concern at that future time").

[87] *Id.  See also id.* (holding that "while proof of prior breach of fiduciary duty would justify the court's requiring a fiduciary to account, proof of such a breach would not, standing alone, ordinarily permit the court to require that a 50% shareholder remain in a corporate joint venture against his will").  Indeed, this court has noted that dissolution is often accompanied by various other litigation, including breach of fiduciary duty claims, due to its very nature.  *See In re Magnolia Clinical Research, Inc.*, 2000 WL 128850, at *2 (Del. Ch. Jan. 3, 2000) ("Section 273 exists to enable deadlocked shareholders to bring closure to what has become an inefficient and unworkable relationship.  As dissolution will not generally be sought if all is well with a joint venture, it follows oft-times that the relationship will be rather strained when a shareholder seeks dissolution under § 273. There may well be related litigation—often involving allegations of breach of fiduciary duty—contemporaneous to a § 273 proceeding.  It makes little sense to deny dissolution pending resolution of these other actions unless, for instance, special circumstances such as those mentioned in *Data Processing* are involved.").

[88] *See Magnolia Clinical Research*, 2000 WL 128850, at *1 ("Respondent also fails to allege sufficiently an attempt by petitioner to exploit personally 'specific future' business opportunities.  She does allege that petitioner 'commenced a competing business and began to divert business of [the company] to such competing business,' and 'hired and attempted to hire [the company's] consultants.'  These allegations, even if taken as true, do not, in my opinion, constitute the 'specific future' harm mentioned by the *Data Processing* court. Furthermore, these allegations, which are similarly asserted in the federal action [brought by the respondent asserting breach of fiduciary duties and tortious interference with

28

Here, Seibel has failed to point to any "specific future" business opportunity that GRUS or Ramsay are seeking to exploit or any specific harm that will arise from the dissolution. This is unsurprising since Seibel has admitted that the only revenue-generating business that GRB has ever engaged in—the Caesars Agreement—was initiated in late 2012 when the Company was founded. Beyond referencing an opportunity that has now been terminated by the other party, Seibel has not identified any "specific future business opportunity"[89] that rightfully belongs to GRB that GRUS is attempting to take for itself through the use of this dissolution proceeding. It is not enough for Seibel merely to state that Ramsay may, at some point in the future, engage in some other burger venture that uses his name and likeness to capitalize on the celebrity and status Ramsay has spent his career building. Seibel cannot reasonably expect that this court would indefinitely lock Ramsay in a failed joint venture and thereby preclude him from ever engaging in a business that bears resemblance to GRB—a restaurant business that exploits Ramsay's celebrity to sell one of the most popular and beloved food preparations in all of history. Any such result would be the antithesis of equitable.

---

contract] can be addressed adequately by the federal court, without interfering with the dissolution action in this Court.").

[89] *Data Processing*, 1987 WL 25360, at \*4.

Even if GRUS, Ramsay and Caesars have engaged in a scheme to usurp corporate opportunities from GRB and Seibel, as Seibel alleges, the scheme has already run its course—Caesars has terminated the Caesars Agreement and GRUS has terminated the License Agreement. Claims relating to these alleged harms can be prosecuted either individually by Seibel or derivatively by a receiver on behalf of GRB as appropriate.[90] Given that this court will allow a dissolution to proceed even when there are first-filed derivative claims pending, there is no principled basis upon which to conclude that *later-filed* derivative claims alleging past harms should stand in the way of an otherwise properly supported petition for dissolution. Unlike in *Mobilactive*, Seibel has not alleged any facts that would allow a reasonable inference that he would not be able to recover fully any damages he is owed if dissolution is granted. Therefore, because Seibel has failed to allege bad faith in the bringing of the dissolution, but rather points only to prior bad acts that predate the Petition and were allegedly undertaken separate and apart from the Petition, equity will not preclude the entry of an otherwise justified decree of dissolution.

---

[90] *See In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *11 (Del. Ch. Aug. 18, 2005) (noting that what remained of the subject business was "possible choses in action" and that "[t]he ability to prosecute those claims does not depend on the continued existence of the LLC, but could, at least in theory, be managed by a court appointed receiver"); *Magnolia Clinical Research*, 2000 WL 128850, at *2 (after ordering dissolution, noting that "[c]ounsel should try to agree upon a proper receiver who will, of course, assess the claims and counterclaims asserted [derivatively] in the federal action in determining how to proceed with the dissolution").

## III. CONCLUSION

For the foregoing reasons, Petitioner's Motion for Judgment on the Pleadings is GRANTED and judicial dissolution is ordered pursuant to 6 *Del. C.* § 18-802. Petitioner shall submit a form of implementing order, on notice to Respondent, within twenty (20) days. In connection with this order, counsel should endeavor to agree upon a proposed liquidating trustee who will, in addition to those powers granted under 6 *Del. C.* § 18-803(b), assess the Counterclaims pending here and the claims in the Nevada Action in determining whether any action should be taken on behalf of GRB in connection with such claims.